# 22-0427-CV

## United States Court of Appeals
### *for the*
## Second Circuit

---

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellant,*

– v. –

NOVARTIS PHARMA AG, NOVARTIS TECHNOLOGY LLC, NOVARTIS
PHARMACEUTICALS CORPORATION, VETTER PHARMA
INTERNATIONAL GMBH,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT
## (REDACTED)

JOSHUA HALPERN
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7000

ADAM B. BANKS
ELIZABETH S. WEISWASSER
ERIC S. HOCHSTADT
ANISH R. DESAI
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Regeneron Pharmaceuticals, Inc. states that it has no parent corporation and that no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................1

ISSUES PRESENTED.....................................................................................7

JURISDICTION...............................................................................................7

STATEMENT OF THE CASE.........................................................................8

    I.    Factual Background................................................................................8

        A.    The U.S. Market For FDA-Approved Anti-VEGF PFS............8

        B.    Novartis And Vetter Secretly Agree To Create
                LUCENTIS PFS, Despite Vetter's Collaboration With
                Regeneron To Develop EYLEA PFS .......................................11

        C.    Novartis Fraudulently Procures The '631 Patent And
                Conspires With Vetter To Block EYLEA PFS From The
                Market ......................................................................................11

        D.    Vetter Leverages the '631 Patent Application To Demand
                Exclusivity From Regeneron ....................................................14

        E.    Defendants Actively Conceal Vetter's Contributions ..............15

        F.    Novartis Sues To Block Regeneron From The Market,
                While Keeping Secret Vetter's True Status As Co-
                Inventor ...................................................................................16

        G.    ITC Staff Find Clear And Convincing Evidence That The
                Patent Is Invalid, And Novartis Withdraws Its ITC
                Complaint..................................................................................17

    II.    Procedural History................................................................................18

        A.    Regeneron Promptly Files Its Antitrust Complaint .................18

        B.    The Case Is Transferred To The Northern District of New
                York.........................................................................................20

C.     The District Court Dismisses The Case On The Pleadings ......21

SUMMARY OF ARGUMENT ............................................................23

STANDARD OF REVIEW ...............................................................26

ARGUMENT ...................................................................................27

I.     Regeneron Plausibly Alleged A Relevant Product Market .................27

     A.     Courts Hesitate To Dismiss For Failure To Plead A Relevant Market .........................................................................27

     B.     Regeneron Adequately Pleaded A U.S. Market For FDA-Approved Anti-VEGF PFS Drugs .............................................29

     C.     The District Court Erred In Dismissing A PFS-Only Market ...................................................................................35

          1.     The District Court Impermissibly Dismissed Or Ignored Key Allegations ...................................................35

          2.     The District Court Erred In Applying A Heightened Pleading Standard To Markets Coextensive With Patent Claims .....................................42

          3.     Products With Like Functions Commonly Exist In Separate Markets ............................................................46

II.     Regeneron's Tortious Interference Claim Was Timely ......................48

     A.     Regeneron's Allegations Establish Equitable Estoppel ............49

     B.     The District Court's Reasons For Failing To Apply Equitable Estoppel Are Factually And Legally Wrong ............52

          1.     The Fraud Was Targeted At Regeneron .........................53

          2.     Regeneron Exercised Reasonable Diligence ..................55

          3.     Regeneron Preserved Its Estoppel Defense ....................58

CONCLUSION .................................................................................59

# TABLE OF AUTHORITIES

## Cases

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015)..................................................34

*Alaska Electrical Pension Fund v. Bank of America Corporation*,
  306 F. Supp. 3d 610 (S.D.N.Y. 2018) ...............................................40

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) .....................................................*passim*

*Avent, Inc. v. Motio, Inc.*,
  No. 12 C 2100, 2015 WL 425442 (N.D. Ill. Jan 30, 2015)................................43

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
  813 F. Supp. 2d 569 (S.D.N.Y. 2011) ...............................................34

*Biochem, Inc. v. Amersham PLC*,
  981 F. Supp. 2d 217 (S.D.N.Y. 2013) ...............................................49

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ....................................................32, 45

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1964)...............................................................*passim*

*Chapman v. New York State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008) ..............................................34

*City of N.Y. v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011) ..............................................38

*Colsa Corp. v. Martin Marietta Servs., Inc.*,
  133 F.3d 853 (11th Cir. 1998) ..............................................28

*Consolidated Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir. 1989) ..............................................47

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012) ..............................................32

*Delano Farms v. California Table Grape Com'n,*
  655 F.3d 1337 (Fed. Cir. 2011) ..........................................................44

*Doe v. Kolko,*
  2008 WL 4146199 (E.D.N.Y. Sept. 5, 2008) ....................................53

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992).............................................................................28

*F.T.C. v. Lundbeck,*
  650 F.3d 1236 (8th Cir. 2011) ......................................................25, 46

*F.T.C. v. Swedish Match,*
  131 F. Supp. 2d 151 (D.D.C. 2000)....................................................47

*Florio v. Cook,*
  399 N.E.2d 947 (N.Y. 1979)................................................................58

*FTC v. AbbVie,*
  976 F.3d 327 (3d Cir. 2020) .........................................................25, 47

*FTC v. Actavis, Inc.,*
  570 U.S. 136 (2013)...............................................................20, 25, 42

*FTC v. Whole Foods Market, Inc.,*
  548 F.3d 1028 (D.C. Cir. 2008).........................................................40

*Geneva Pharms. Tech v. Barr Labs.,*
  386 F.3d 485 (2d Cir. 2004) ..................................................... *passim*

*Golden Budgha Corp. v. Canadian Land Co.,*
  931 F.2d 196 (2d Cir. 1991) ..............................................................50

*Horn v. Politopoulos,*
  628 F. App'x 33 (2d Cir. 2015) ..........................................................58

*Hydril Co. LP v. Grant Prideco LP,*
  474 F.3d 1344 (Fed. Cir. 2007) ........................................................43

*Kamruddin v. Desmond,*
  741 N.Y.S.2d 559 (2d Dep't 2002).................................26, 50, 52, 56

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................34

*Kronos, Inc. v. AVX Corp.*,
612 N.E.2d 289 (N.Y. 1993) .................................................................................49

*Langston v. MFM Contr. Corp.*,
102 N.Y.S.3d 12 (1st Dep't 2019) ........................................................................51

*Lifewatch Services Inc. v. Highmark Inc.*
902 F.3d 323 (3d Cir. 2018) .................................................................................35

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
275 F.3d 762 (9th Cir. 2001) ................................................................................31

*Maxon Hyundai Mazda v. Carfax, Inc.*,
No. 13-2680 (AJN), 2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014) ....................34

*Monsanto Co. v. McFarling*,
302 F.3d 1291 (Fed. Cir. 2002) ...........................................................................44

*Nalco Co. v. Turner Designs, Inc.*,
2014 WL 645365 (N.D. Cal. Feb. 19 2014) ........................................................43

*Pannu v. Lolab Corp.*,
155 F.3d 1344 (Fed. Cir. 1998) ...........................................................................12

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002) ................................................................................32

*Rich v. Fox News Network, LLC*,
939 F.3d 112 (2d Cir. 2019) ................................................................................49

*Ross v. Louise Wise Services, Inc.*,
868 N.E.2d 189 (N.Y. 2007) ................................................................................50

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) ......................................................................28, 40

*New York ex rel. Scheiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ................................................................................46

*Schenker AG v. Societe Air France*,
    102 F. Supp. 3d 418 (E.D.N.Y. 2015) ................................................56

*Matter of Steyer*,
    521 N.E.2d 429 (N.Y. 1988).........................................26, 50, 51, 56

*Thompson v. 1-800 Contacts*,
    No. 2:16-CV-1183-TC, 2018 WL 2271024
    (D. Utah May 17, 2018)..................................................................34

*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953)........................................................................48

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ....................................................*passim*

*Transweb, LLC v. 3M*,
    812 F.3d 1295 (Fed. Cir. 2016) ................................................43, 44

*Twersky v. Yeshiva Univ.*,
    993 F. Supp. 2d 429 (S.D.N.Y. 2014) ......................................53, 54

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) ...........................................................47

*United Food & Com. Workers Local 1776 v. Teikoku Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017)..........................................47

*United States. v. American Express Co.*,
    838 F.3d 179 (2d Cir. 2016) ......................................................23, 28

*United States v. Archer-Daniels-Midland Co.*,
    866 F.2d 242 (8th Cir. 1988) .........................................................47

*United States. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (*en banc*).........................................46

*United States v. Visa U.S.A.*,
    344 F.3d 229 (2d Cir. 2003) ....................................................36, 47

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ......................................................*passim*

*Wacker v. JP Morgan Chase,*
    678 F. App'x 27 (2d Cir. 2017) ..........................................................34

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
    382 U.S. 172 (1965) ................................................................*passim*

## Statutes

15 U.S.C. § 1 ...............................................................................................8

15 U.S.C. § 2 ...............................................................................................8

15 U.S.C. § 4 ...............................................................................................7

15 U.S.C. § 15 .............................................................................................7

15 U.S.C. § 26 .............................................................................................7

28 U.S.C. § 1291 .........................................................................................7

28 U.S.C. § 1331 .........................................................................................7

28 U.S.C. § 1337 .........................................................................................7

28 U.S.C. § 1367 .........................................................................................7

28 U.S.C. § 1404 .......................................................................................20

35 U.S.C. § 116 .........................................................................................11

37 C.F.R. § 1.56 ........................................................................................11

37 C.F.R. § 1.63 ........................................................................................12

## Other Authorities

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (2018)..................32

Michael S. Sinha, et al., *Antitrust, Market Exclusivity, and
    Transparency in the Pharmaceutical Industry*, 319 AM. MED.
    ASS'N 2271 (2018) ...............................................................................41

## INTRODUCTION

The district court dismissed Regeneron's 122-page antitrust complaint at the pleading stage based on Regeneron's supposed failure to plead a relevant market.[1] That startling decision not only contradicted and ignored Regeneron's detailed allegations, but it applied an unprecedented rule of law at odds with settled doctrine and advanced by neither side in this litigation. If allowed to stand, the district court's decision will have significant adverse implications for the enforcement of antitrust laws and the public health. This Court should reverse.

Millions of elderly Americans suffer from debilitating eye diseases caused by the overproduction of a protein called vascular endothelial growth factor ("VEGF"). Practitioners historically administered treatments combating these serious conditions—known as "anti-VEGF" treatments—from vials, requiring a multi-step process to extract medication from the vial, exchange needles, and inject the medication into a patient's eye. The development of pre-filled syringes ("PFS") greatly improved the delivery of anti-VEGF drugs. Hailed as a "boon to patients," anti-VEGF PFS treatments provide more accurate dosing, require fewer steps to administer, and reduce the risk of severe complications, such as inflammation of the

---

[1] "Regeneron" is Plaintiff-Appellant, Regeneron Pharmaceuticals, Inc. "Novartis" refers to Defendants-Appellees Novartis Pharma AG, Novartis Technology LLC and Novartis Pharmaceuticals Corp. "Vetter" is Defendant-Appellee Vetter Pharma International GmbH.

interior of the eye. As a result, physicians now overwhelmingly prefer and prescribe anti-VEGF drugs in the PFS presentation. As Regeneron's antitrust complaint explained, the market for anti-VEGF PFS is distinct from and does not include vials.

Recognizing that PFS offer a competitive advantage over vials, Novartis and Vetter—a leading "filler" of anti-VEGF drugs—embarked on an anticompetitive scheme to block Regeneron's superior anti-VEGF treatment, EYLEA PFS, from competing in the market for anti-VEGF PFS drugs. As the cornerstone of that effort, Novartis secured U.S. Patent No. 9,220,631 (the "'631 Patent"), which is directed to an anti-VEGF in a PFS, including specifically EYLEA, and then sued Regeneron in two separate infringement proceedings. But Novartis obtained that patent only by defrauding the U.S. Patent and Trademark Office ("PTO"): during prosecution, it knowingly withheld information showing that Vetter employees should have been named as co-inventors, and it knowingly withheld material prior art demonstrating that the claimed invention is obvious. What's more, Novartis and Vetter agreed to conceal Vetter's co-inventorship to deny Regeneron its ownership rights in any patent directed to EYLEA PFS by virtue of Regeneron's separate pre-existing PFS development agreement with Vetter. This conduct violated Sections 1 and 2 of the Sherman Act, *see Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965), and tortiously interfered with Regeneron's contract with Vetter.

The district court, however, dismissed the case at the pleading stage, for failure to allege a relevant product market of anti-VEGF PFS as distinct from vials. The decision was deeply flawed: the district court flouted controlling decisions of the Supreme Court and this Court on market definition in favor of its own novel and erroneous test; ignored allegations in the complaint; drew inferences against Regeneron; and decided questions of fact rather than accepting the complaint's allegations as true. The case for reversal is clear.

Market definition is a quintessentially fact-intensive issue requiring close scrutiny of commercial realities. Only in the rarest of circumstances is market definition a ground for dismissal at the pleading stage. This case is not one of them. Regeneron's complaint contains detailed factual allegations that support its proposed market definition under the established legal framework. Regeneron alleged lack of reasonable interchangeability and cross-elasticity of demand, specifically alleging that physicians, faced with a small, but significant increase in the price of PFS, would *not* switch patients to vials. Regeneron supported that claim with detailed factual allegations about the numerous practical and medical advantages of PFS over vials; the demonstrated massive physician preference for PFS over vials; Novartis's own admissions about its pricing power in the PFS market; and other "practical indicia" courts have long recognized as significant in defining product markets.

The district court set aside the proper fact-intensive market definition inquiry and ended this case at the pleading stage based on its own made-up rule that contravenes the controlling cases. According to the district court, a market presumptively cannot be coextensive with a patent's claims. That novel rule is wrong as a matter of law and logic: the presence of a patent does not displace traditional antitrust principles, which are focused on commercial realities, not formalism. And no court has adopted it—indeed, the court's rule flouts even *Walker Process* itself. It would also lead to devastating effects for consumers, immunizing abuses of the patent system whenever the patent and market are coextensive.

Armed with its newly minted rule, the district court ignored Regeneron's allegations and made erroneous findings that contradicted the complaint's allegations. Among other things, notwithstanding the industry recognition (including Novartis's own admissions) of the substantial practical and medical advantages of PFS over vials, the district court simply declared that PFS was only "marginally superior" to vials. The court never explained the basis for that reductive assessment—and there was none. Especially at the pleading stage, the court had no license to re-write the complaint and decide that the significant convenience to doctors, accuracy of administration and safety benefits alleged in the complaint were merely "marginal."

For example, Regeneron alleged that within months of PFS's launch, physicians converted the overwhelming majority of their patients from vials to PFS *precisely because* the benefits of PFS were more than marginal. The district court devoted a single sentence—in a footnote—to that powerful allegation, speculating that a PFS price increase might cause physicians to "simply switch back to their vials." The court again offered *no basis* for that assumption, but more importantly, Regeneron alleged the *exact opposite* in the complaint—that a small, but significant price increase *would not* cause physicians to switch from PFS to vials. That allegation must be taken as true at the motion-to-dismiss stage, and the district court had no mandate to draw a groundless inference to the contrary.

In fact, as regards pricing, the complaint went even further, quoting Novartis's own admission that increased competition from EYLEA *PFS* led to reduced market share and "price erosion" in ways that EYLEA *vials* never did. That concession did not fit with the district court's perfunctory dismissal of Regeneron's allegations, so it simply ignored it. At bottom, an antitrust complaint need only allege facts that "bear a rational relation to the methodology courts prescribe to define a market" and include "a plausible explanation as to why a market should be limited" as alleged. *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.). Regeneron's complaint did all of this and more.

Finally, the district court dismissed Regeneron's tortious interference claim as time-barred. But, once again, the court refused to credit the allegations in the complaint and relied on erroneous legal principles to dismiss the claim. The complaint alleged in detail how Novartis had fraudulently concealed its wrongdoing for years, and thus is equitably estopped from asserting a statute of limitations defense. The court did not question whether Novartis had taken steps to conceal its misconduct. Nonetheless, the court insisted that Novartis's deception did not count because its fraud on the PTO was directed at the "public" and not specifically Regeneron. That is wrong on multiple levels—there is no "public deception" exception to estoppel and, regardless, the complaint alleged specific acts directed at Regeneron, including that Novartis transferred to itself exclusive enforcement authority over the patent so that it could sue *Regeneron* without also exposing Vetter's role. And, while the court claimed to find in *Regeneron's own allegations* evidence that Regeneron should have done more to discover that Vetter was a co-inventor, it never paused to explain *how* Regeneron should have unearthed that secret information. In fact, Regeneron alleged that when it requested copies of Vetter's agreement with Novartis, it was repeatedly rebuffed. This Court should reverse.

**ISSUES PRESENTED**

1.      Whether the district court erred in rejecting at the pleading stage Regeneron's proposed product market of FDA-approved anti-VEGF PFS, when the First Amended Complaint alleged that a small, but significant, increase in the price of anti-VEGF PFS would not drive patients to vials because, among other things, (1) PFS is a "more safe, effective, and efficient" method of administration than vials; (2) physicians shifted their patients, quickly and in droves, from vials to PFS, demonstrating a strong preference for PFS; (3) Novartis admitted that EYLEA PFS exerted unique downward pricing pressure on the only other anti-VEGF PFS; (4) industry experts and participants recognize the substantial benefits of PFS over vials; and (5) PFS involves unique production facilities and regulatory approvals.

2.      Whether the district court erred in dismissing the tortious interference claim as time barred on the pleadings, when Regeneron alleged in detail and with specificity that Novartis actively concealed its fraud.

**JURISDICTION**

The district court entered its final judgment on January 31, 2022. SPA44. Regeneron timely appealed on February 25, 2022. A921.

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1367, and 15 U.S.C. §§ 4, 15, 26. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

Regeneron brought this antitrust suit under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, asserting attempted monopolization through *Walker Process* fraud and unreasonable restraint of trade. Regeneron also asserted a state-law claim for tortious interference with contract. The district court (Hurd, J.) granted Defendants' motions to dismiss the complaint with prejudice, dismissing Regeneron's antitrust claims because Regeneron had failed to plausibly plead a product market of anti-VEGF PFS treatments and its tortious interference claim as time barred.

## I. Factual Background[2]

### A. The U.S. Market For FDA-Approved Anti-VEGF PFS

Millions of elderly Americans every year suffer from severe eye diseases that result from the overproduction of a naturally occurring protein in the body called vascular endothelial growth factor ("VEGF"). A336, CA3 (¶ 5); A349-350, CA16-17 (¶¶ 36-46). In the United States, EYLEA and LUCENTIS are the two primary FDA-approved drugs that treat VEGF overproduction. A348, CA15 (¶¶ 33-35).[3]

---

[2] The facts included in this section are drawn from the well-pleaded allegations in the complaint, which the district court was required to assume as true. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

[3] Novartis and Genentech, a wholly owned subsidiary of Roche, jointly developed LUCENTIS. A351, CA18 (¶ 48). Genentech has commercialization rights over LUCENTIS in North America, and licenses the '631 Patent from Novartis to commercialize LUCENTIS PFS. A352, CA19 (¶ 54). Novartis maintains exclusive

Although both drugs are administered through regular injections directly into a patient's eye, EYLEA provides longer protection and requires less frequent injections than LUCENTIS. A350, CA17 (¶ 47); A351-353, CA18-20 (¶¶ 50-56); A354, CA21(¶ 59).

The two drugs were historically sold only in vial form. A336, CA3 (¶ 6). Drugs in the vial form come with multiple components, including the vialed biologic drug, two separate needles, and a plastic syringe. A360, CA27 (¶ 76). Administration in vials involves a multi-step process in which the provider must first use a filter needle to withdraw the correct amount of the anti-VEGF from the vial and then switch to an injection needle before injecting the properly measured dosage into the patient's eye—all while carefully maintaining sterile conditions in the doctor's office. *Id.*

In the past several years, LUCENTIS and EYLEA have each been introduced in a PFS to facilitate a "more safe, effective, and efficient" injection process. A355, CA22 (¶ 62); A362, CA29 (¶ 82). For example, leading medical journals have recognized that PFS "are a boon to patients … and retinal physicians because of the

---

commercialization rights to sell LUCENTIS in the rest of the world. A352, CA19 (¶¶ 52-54). As of 2020, Novartis owned a 33.3% stake in Roche worth approximately $12.9 billion. A352, CA19 (¶ 53). Novartis also markets BEOVU, another anti-VEGF, in the United States; it has only been available in vial until June 2022 and its "launch has been riddled with serious safety issues." A334-335, CA1-2 (¶¶ 2-3).

decreased endophthalmitis risk, dose accuracy, and improved clinic efficiency they can provide." A361, CA28 (¶ 78). More specifically, medical literature and studies indicate that PFS: reduces the risk of endophthalmitis (harmful inflammation of the interior of the eye) by fifty percent relative to vials, A362, CA29 (¶ 80); A418, CA85 (¶ 197); offers a more accurate dose than vials by eliminating the need to manually withdraw the liquid, A361, CA28 (¶ 79); A363, CA30 (¶ 84); and reduces preparation time relative to vials by forty percent, minimizing patient wait time and enabling ophthalmologists to see additional patients throughout the day. A362, CA29 (¶ 80). Novartis itself has repeatedly touted these benefits, proclaiming that PFS "mitigates the problems associated with vials," A417, CA84 (¶ 196), and "permit[s] more safe, effective and efficient injections" into the eye than vials allow, A347, CA14 (¶ 29); A362, CA29 (¶ 82).

These benefits have caused physicians to convert their patients, quickly and in droves, from vials to PFS. A417, CA84 (¶ 196). Market data show that once EYLEA PFS and LUCENTIS PFS launched, physicians rapidly converted 80% to 100%, respectively, of their patients from vials to PFS. A355, CA22 (¶ 62); A363, CA30 (¶ 85); A365, CA32 (¶ 88). Novartis explained to shareholders that PFS provided LUCENTIS a "competitive advantage" over vials, A363, CA30 (¶ 85), and Regeneron predicted in 2020 that "nearly all EYLEA sales [would] convert to PFS within the year." A355, CA22 (¶ 62).

**B.      Novartis And Vetter Secretly Agree To Create LUCENTIS PFS, Despite Vetter's Collaboration With Regeneron To Develop EYLEA PFS**

Vetter is a leading global supplier of drug "filling" services and has long provided non-exclusive filling services for Regeneron's EYLEA vials. A334, CA1 (¶ 2); A336, CA3 (¶ 7). In 2005, Regeneron and Vetter began a collaboration to develop a PFS for EYLEA. A336, CA3 (¶ 7); SPA6. The PFS development agreement between them assigned to Regeneron an ownership interest in any patent conceived or reduced to practice by Regeneron *or* Vetter related to EYLEA PFS. A394, CA61 (¶ 148); A396-398, CA63-65 (¶¶ 152-153); SPA6; CA316. But unbeknownst to Regeneron, Vetter later entered into a collaboration with Novartis to develop and commercialize a PFS for LUCENTIS. A399, CA66 (¶ 155); SPA7. In 2009, Vetter and Novartis entered into a confidential agreement in which Vetter agreed to help develop a PFS for LUCENTIS. A399, CA66 (¶ 155); CA307.

**C.      Novartis Fraudulently Procures The '631 Patent And Conspires With Vetter To Block EYLEA PFS From The Market**

In December 2015, Defendants' secret collaboration culminated in the '631 Patent. The '631 Patent claims an anti-VEGF PFS, and specifically claims EYLEA PFS, identifying it as the "preferred" anti-VEGF for use with the invention. A337, CA4 (¶ 8 & n.4); *see also* A912 at 6:38-44; A919 at 19:40-44. But, for two reasons, the '631 Patent should never have issued: first, the underlying application failed to name Vetter as a necessary co-inventor, as patent law requires, 35 U.S.C. § 116; 37

C.F.R. §§ 1.56, 1.63; and second, the claimed invention was obvious in light of prior art. A341, CA8 (¶ 13); A368-387, CA35-54 (¶¶ 95-137); A393-394, CA60-61 (¶¶ 147-148); A403, CA70 (¶ 165). Novartis surmounted these fatal detects only through an intricate scheme of fraud and inequitable conduct.

*First*, Novartis concealed Vetter's contributions to LUCENTIS PFS from the PTO specifically to circumvent Regeneron's ownership rights under its development agreement with Vetter. A341, CA8 (¶ 13); A393-394, CA60-61 (¶¶ 147-148); A403, CA70 (¶ 165). As confidential discovery revealed, *infra* at 17, Novartis had expressly acknowledged in September 2013, in an amendment to the PFS development agreement between Novartis and Vetter (the "2013 Amendment"), that Vetter had significantly contributed to developing LUCENTIS PFS. A391, CA58 (¶ 146); CA231; SPA7.[4] Under the PFS development agreement between Regeneron and Vetter, those significant contributions should have vested Regeneron with ownership rights in any patent that arose from the collaboration between Vetter and Novartis. A394, CA61 (¶ 148); A396-398, CA63-65 (¶¶ 152-153); CA316; SPA9. Novartis knew this to be true. A395, CA62 (¶ 149); A403, CA70 (¶ 165). And so it purchased Vetter's silence by contemporaneously granting it ████

---

[4] *See also* A389-391, CA56-58 (¶¶ 140-146) (describing Vetter's development contributions); *Pannu v. Lolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998) (joint inventor is one who "contribute[s] in some significant manner to … the invention").

████████████████████████████ and a co-exclusive license over the '631 Patent. A403, CA70 (¶ 165). That alignment of incentives enabled Novartis to keep Vetter's role as a co-inventor secret from the PTO and Regeneron until 2020. A337-338, CA4-5 (¶ 9 n.5); A339, CA6 (¶ 11); A400, CA67 (¶ 157); A403, CA70 (¶ 165); A443, CA110 (¶ 265).

*Second,* Novartis knowingly withheld material prior art during the prosecution of the '631 Patent. A368-387, CA35-54 (¶¶ 95-137). During prosecution, the PTO examiner repeatedly rejected the application for the '631 Patent as being obvious until Novartis narrowed the application to claim a "terminally sterilized" PFS. A374-375, CA41-42 (¶¶ 108-109). However, Novartis failed to disclose numerous prior art references regarding terminal sterilization. A375, CA42 (¶ 110). Novartis knew the undisclosed prior art regarding a terminally sterilized PFS was material: a different PTO examiner had pointed repeatedly to that prior art in rejecting a separate PFS-related patent application from Novartis. A376-381, CA43-48 (¶¶ 111-123). The attorneys who prosecuted that failed patent application were the very same attorneys who prosecuted the '631 Patent application, as were some of the named inventors. A376-381, CA43-48 (¶¶ 111-123). Still, Novartis chose to withhold the prior art it knew to be material, in the hopes that the patent examiner presiding over the '631 Patent application would fail to detect the deficiency. A375, CA42 (¶ 110); A381, CA48 (¶ 124). That gambit worked, and in December 2015, the '631 Patent

issued. A337, CA4 (¶ 9); A387, CA54 (¶ 136); A393, CA60 (¶ 147). The '631 Patent

would not have issued had the examiners been aware of the omitted prior art. A427,

CA94 (¶ 221).

Indeed, the Patent Trial and Appeal Board ("PTAB") has since instituted *inter*

*partes* review ("IPR") of the '631 Patent, finding that Regeneron had "established a

reasonable likelihood of prevailing on its assertion that at least one of claims [in the

patent] would have been obvious over" the same prior art that Novartis knowingly

withheld during prosecution. A862-868.[5] The IPR proceeding is pending and the

PTAB will issue a final written decision by October 2022. A840.

### D. Vetter Leverages the '631 Patent Application To Demand Exclusivity From Regeneron

In October 2013, after approximately eight years of collaboration on EYLEA

PFS, Vetter—acting at the behest of Novartis—demanded that Regeneron accept the

following onerous conditions if it wished to continue their collaboration: first,

Regeneron would need to take out a license on the *not-yet-issued* patent; second,

Regeneron would need to agree in advance *never to challenge the patent* once it

issued; and third, Regeneron would need to commit to use Vetter as its *exclusive*

*PFS filler* for the life of the '631 Patent (approximately twenty years) without any

guaranteed supply commitment by Vetter. A404-406, CA71-73 (¶¶ 166-170). This

---

[5] In addition, as discussed *infra* at 17, the ITC Staff reached the same conclusion.

was the first time in their near-decade of working together that Vetter had demanded exclusivity. A404, CA71 (¶¶ 166-167).

Regeneron could not agree. It questioned whether Vetter alone could meet all of its filling needs for EYLEA, A405-406, CA72-73 (¶¶ 168-169), and it worried that a twenty-year exclusivity arrangement could substantially constrain its ability to meet its EYLEA filling volume and compete effectively with Novartis. A404, CA71 (¶ 167). After Regeneron rejected Vetter's all-or-nothing exclusivity offer, Vetter and Novartis jointly agreed to cut off Regeneron entirely, denying Regeneron access to any of Vetter's filling services for EYLEA PFS. A408, CA75 (¶¶ 174-175).

### E. Defendants Actively Conceal Vetter's Contributions

Regeneron responded to Vetter's unusual demands with specific and repeated requests for further information about Vetter's licensing rights. A410, CA77 (¶ 179). Between October 2013 and August 2014, Regeneron had multiple communications with Vetter regarding its sublicense demand, in which Regeneron made specific requests for information about Vetter's licensing rights and the Vetter-Novartis settlement agreement referenced in the demand. A410, CA77 (¶ 179), A447, CA114 (¶ 273). Acting pursuant to its agreement with Novartis, Vetter refused to provide copies of the underlying agreement and actively concealed from Regeneron its employees' contributions to LUCENTIS PFS. A408, CA75 (¶ 176); A410,

CA77 (¶ 179). When the parties revisited terms in October 2017, Vetter continued to conceal its contributions and again insisted that it could work with Regeneron only if it acquiesced to a long-term exclusivity agreement and committed never to challenge the '631 Patent. A408, CA75 (¶ 176); A410, CA77 (¶ 179).

### F. Novartis Sues To Block Regeneron From The Market, While Keeping Secret Vetter's True Status As Co-Inventor

On December 9, 2019, Regeneron began selling EYLEA PFS in the United States. Less than two weeks later, Vetter transferred to Novartis sole enforcement rights over the '631 Patent. A413, CA80 (¶ 186); CA245; SPA11. That way, Novartis could sue to block Regeneron without naming Vetter as a co-party, staving off discovery of Vetter's status as co-inventor. A414, CA81 (¶ 187).

In June 2020, after 80% of patients had already switched from EYLEA vials to PFS, Novartis sued Regeneron in an effort to monopolize the anti-VEGF PFS market. A414, CA81 (¶ 188). Novartis filed a patent-infringement complaint in the District Court for the Northern District of New York, seeking damages and an injunction to stop Regeneron from selling EYLEA PFS. A344, CA11 (¶ 19); A414, CA81 (¶ 188). On that same day, Novartis also filed a complaint with the U.S. International Trade Commission ("ITC") to stop Regeneron from selling EYLEA PFS, through an order barring importation of certain EYLEA PFS components into the U.S. A344, CA11 (¶ 19); A414, CA81 (¶ 188).

During discovery in the ITC action, Regeneron secured a copy of the 2013 Amendment and learned for the first time of Vetter's role in inventing and developing key features of LUCENTIS PFS. A337, CA4 (¶ 9 n. 5); A390, CA57 (¶ 142); A410, CA77 (¶ 179 n.68); CA231. But because of a protective order applicable in that proceeding, Regeneron was unable to use any of that information until the agreement was produced again in this litigation in December 2020. A337, CA4 (¶ 9 n. 5); A410, CA77 (¶ 179 n.68).

### G. ITC Staff Find Clear And Convincing Evidence That The Patent Is Invalid, And Novartis Withdraws Its ITC Complaint

In advance of trial, the ITC's independent Office of Unfair Import Investigations (the "Staff") prepared a 203-page brief finding "clear and convincing evidence" that Novartis's '631 Patent is invalid because Novartis failed to disclose the Vetter inventors and was obvious in light of the same prior art that Novartis withheld from the PTO. A619-701, CA392-474. The Staff's brief further explained that a ruling for Novartis could constrict dramatically the supply of anti-VEGF PFS and thereby pose a "severe risk to public health and welfare," as "patients may suffer either temporary or permanent vision loss, up to and including blindness, because they are unable to obtain the relevant anti-VEGF drugs." A753-756, CA526-529. After receiving the Staff's brief, and just a week before trial was set to begin, Novartis moved to terminate the ITC action. A572.

## II.    Procedural History

### A.    Regeneron Promptly Files Its Antitrust Complaint

In July 2020, less than one month after Novartis sued Regeneron, Regeneron filed this antitrust action in the District Court for the Southern District of New York. Regeneron amended its complaint in January 2021 to include allegations of inventorship fraud one month after discovery confirmed Vetter's secret co-inventorship. A337, CA4 (¶ 9 n.5); A410, CA77 (¶ 179 n.68). The amended complaint ("FAC")—which spans 122 pages and 294 paragraphs—described in significant detail Defendants' elaborate scheme to insulate LUCENTIS PFS from competition in the anti-VEGF PFS market.

The FAC included five counts—four antitrust claims and a fifth claim for tortious interference with contract. Three of the antitrust claims were against Novartis only, and they alleged attempted monopolization through *Walker Process* fraud in violation of Section 2 of the Sherman Act. A426-438, CA93-105 (¶¶ 218-250); A448-451, CA115-118 (¶¶ 276-284).[6] The fourth antitrust count, against both Defendants, alleged an agreement to unreasonably restrain trade in violation of Section 1 of the Sherman Act. A438-448, CA105-115 (¶¶ 251-275).

---

[6] In *Walker Process*, 382 U.S. at 174, the Supreme Court established that a patent owner can violate Section 2 of the Sherman Act through fraudulent procurement and enforcement of a patent.

For each of these claims, Regeneron defined the relevant market as the U.S. market for FDA-approved anti-VEGF PFS. A415, CA82 (¶ 191); A427, CA94 (¶ 223). The FAC alleged that a small, but significant, price increase on PFS would not prompt a shift to vials because: (1) PFS are a "more safe, effective, and efficient" method of administration than vials (*e.g.*, A336, CA3 (¶ 6); A356-364, CA23-31 (¶¶ 76-87); A417-418, CA84-85 (¶¶ 196-197)); (2) more than 80% of patients switched quickly from vials to PFS (*e.g.*, A360-363, CA27-30 (¶¶ 76-84); A415-419, CA82-86 (¶¶ 191-200); A425, CA92 (¶ 215)); (3) EYLEA PFS forced Novartis to lower the price of LUCENTIS PFS, even though Novartis had already been competing against EYLEA in vial form (*e.g.*, A445, CA112 (¶ 268)); and (4) PFS require specialized production processes and separate regulatory approvals (*e.g.*, A419, CA86 (¶ 199)).

The fifth count, against Novartis, was for tortious interference with contract. A451-454, CA118-121 (¶¶ 285-294). Novartis knew that Regeneron and Vetter had a pre-existing contract for the development of EYLEA PFS that gave Regeneron ownership rights in Vetter's contributions to the '631 Patent. A452, CA119 (¶¶ 287-289); SPA6. Novartis procured Vetter's breach of that contract by omitting Vetter co-inventors on the patent application and then purchasing Vetter's silence and acquiescence in the patent through an exclusive license and a lucrative ███████

████████████. A453, CA120 (¶¶ 290-291).[7] The FAC further explained that Novartis obscured its interference by, among other things, fraudulently concealing Vetter's identity from the PTO, withholding from Regeneron the 2013 Amendment that acknowledged Vetter's role, and transferring to itself sole enforcement authority over the '631 Patent. A413-414, CA81-82 (¶¶ 186-187); A450, CA117 (¶ 283); A453, CA120 (¶ 292); SPA7, 11.

### B. The Case Is Transferred To The Northern District of New York

Defendants moved to dismiss, stay or transfer the case. A8 (ECF No. 41). Notably, however, Novartis did not move for dismissal of the antitrust claims based on the underlying merits of the prior art withheld from the PTO. A134. Then-District Court Judge Alison J. Nathan, to whom the case was originally assigned, allowed discovery to proceed for a year while that motion was pending, before transferring the case under 28 U.S.C. § 1404 to the Northern District of New York, where Novartis's separate patent-infringement suit against Regeneron was filed. A267. Once transferred, the case was assigned to Judge Thomas J. McAvoy, then reassigned to Chief Judge Glenn T. Suddaby, and then reassigned once more to Judge David N. Hurd. A20 (ECF No. 140); A27 (ECF Nos. 212, 215).

---

[7] *See FTC v. Actavis, Inc.*, 570 U.S. 136, 141 (2013) (holding that a patent owner's reverse settlement payments can violate the antitrust laws).

### C. The District Court Dismisses The Case On The Pleadings

On January 31, 2022, without holding a hearing, the district court dismissed the complaint in its entirety with prejudice and denied Regeneron further opportunity to amend.

The district court dismissed the four antitrust claims solely for failure to plead a relevant product market. The court deemed Regeneron's PFS-only market "strange," and it held that a market coextensive with a patent is implausible unless "the subject of a patent is *so novel* that there really is no fitting substitute." SPA25-27 (emphasis added). The Court believed Regeneron "bore the burden" of satisfying this heightened standard because its proposed PFS-only market was "identical to the protection afforded to Novartis by the '631 Patent." SPA24, 27.

The Court disposed of Regeneron's specific allegations without meaningful analysis. The court began by diminishing PFS's functional benefits as showing that PFS was only "marginally superior" to vials, SPA28; it then downplayed the massive one-way patient shift from vials to PFS on the hypothesis that a PFS price increase *might* cause patients to "simply switch back to their vials," SPA28 & n.6; and it dismissed the unique production process for PFS on the theory that it "say[s] nothing about whether a consumer would find a vial and PFS interchangeable." SPA25.

Next, the district court rejected the tortious interference claim as time-barred under New York's three-year statute of limitations. SPA32-34.[8] Regeneron argued that the limitations period should be subject to equitable tolling because Defendants actively concealed their fraudulent scheme in the years leading up to the patent-infringement litigation. *See* A341, CA8 (¶ 13); A409-411, CA76-78 (¶¶ 178-180); A453, CA120 (¶ 292). The district court first erroneously stated that Regeneron had not "defend[ed]" the timeliness of its tortious interference claim, which supposedly "justif[ied] dismissal on its own," SPA31, even though Regeneron argued that "all" of its claims were timely. A554, CA214. The court then declined to apply equitable estoppel for two reasons: it believed that Novartis's deception was directed only at the "public" at large and that Regeneron "had notice sufficient to call for further investigation into whether it had a tortious interference claim as early as 2013." SPA32-34. The Court did not say what "further investigation" was required, nor did it address the fact that Regeneron was rebuffed repeatedly in its requests for

---

[8] Although Defendants argued that all of Regeneron's claims were untimely, the district court did not question the timeliness of Regeneron's antitrust claims. *See* SPA31 ("Regeneron provided a staunch defense for the timeliness of its antitrust claims."). As Regeneron argued, its *Walker Process* claims accrued in June 2020 when Novartis asserted the fraudulently procured '631 Patent against Regeneron, and Regeneron filed this lawsuit the next month. A231-232. In addition, Regeneron explained that its antitrust conspiracy claim was timely because the anti-VEGF PFS market did not come into existence until 2017 when LUCENTIS PFS launched and because the fraudulent concealment and continuing violation doctrines prevented the claim from accruing. A233-236.

information about the Defendants' collaboration. *E.g.*, A409-411, CA76-78 (¶¶ 178-180); A453, CA120 (¶ 292).

## SUMMARY OF ARGUMENT

**I.A.** The fundamental market definition question is whether the relevant product market is limited to PFS (as Regeneron alleged) or also includes vials (as the district court concluded); and that question is answered, primarily, by asking in turn whether a small, but significant price increase for PFS would cause purchasers to switch to vials. *See Todd*, 275 F.3d at 201-02. That ultimate inquiry depends heavily on real-world consumer preferences, which are typically shown after discovery. And because that inquiry is inherently fact-bound, courts are especially "hesitat[ant] to grant motions to dismiss for failure to plead a relevant product market." *United States v. American Express Co.*, 838 F.3d 179, 199 (2d Cir. 2016). At the pleading stage, Regeneron was required to provide no more than a "plausible explanation as to why a market should be limited" to exclude vials. *Todd*, 275 F.3d at 200.

**B.** Regeneron satisfied its pleading burden. The FAC alleged repeatedly that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS," and it supports that allegation with a battery of specific factual allegations: (1) PFS are a "more safe, effective and efficient" method of administration than vials; (2) patients and doctors have

23

converted in droves from vials to PFS; (3) Novartis has admitted that it enjoyed pricing power in the PFS market; and (4) anti-VEGF PFS require distinct production facilities and regulatory approvals. Under controlling precedent, these allegations—separately and collectively—make a PFS-only market at least plausible, if not compelled. That is, if Regeneron proved these allegations, a reasonable fact finder could accept the proposed PFS-only market.

**C.** The district court reached a contrary result only by ignoring and disputing Regeneron's key allegations. *First,* the court said that PFS is only "marginally superior to the vial," SPA28, despite the *substantial* medical benefits alleged in the complaint. *Second*, it dismissed the massive one-way shift from vials to PFS, speculating that patients might "switch back to their vials" if the price of PFS went up—even though the FAC plausibly alleged the opposite. SPA28 & n.6*; see also*, *e.g.*, A419, CA86 (¶ 200). *Third*, the court never even acknowledged Novartis's admission that it had pricing power in the PFS market. *See* A425, CA92 (¶ 215). *Fourth*, the court claimed Regeneron's allegations about separate equipment and production for PFS "say nothing" about market definition, SPA25, despite a *holding* from the Supreme Court to the contrary, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1964). These obvious and elementary legal errors warrant reversal.

The district court purported to justify its treatment of the FAC based on an invented legal rule that markets generally cannot be coextensive with a patent.

SPA25-27. That is incorrect. Markets are often coextensive with patents, *Walker Process*, 382 U.S. at 177-78, and the presence of the patent does not alter the traditional antitrust analysis, *Actavis*, 570 U.S. at 141. The district also suggested it was "strange" that PFS and vials would exist in separate markets even though they contain the same anti-VEGF. SPA24. But that is standard fare in antitrust law, with well-defined markets frequently excluding products with some measure of functional interchangeability. *E.g., FTC v. AbbVie*, 976 F.3d 327, 373 (3d Cir. 2020); *Geneva Pharms. Tech v. Barr Labs.,* 386 F.3d 485 (2d Cir. 2004); *FTC v. Lundbeck*, 650 F.3d 1236, 1241 (8th Cir. 2011). None of this can justify the district court's dismissive approach to the FAC's actual allegations.

**II.A.** Regeneron's complaint also sufficiently alleged a claim for tortious interference with contract against Novartis. Although the statute of limitations is three years under New York law, Novartis is equitably estopped from asserting the defense because it fraudulently concealed the underlying facts in at least four ways. *First*, Novartis purchased Vetter's silence through a lucrative exclusive-licensing deal; *second*, Vetter—acting in concert with Novartis—hid the details of its involvement, despite Regeneron's repeated inquiries with Vetter about the nature of its agreement with Novartis; *third,* Novartis transferred to itself exclusive enforcement authority over the patent in 2019 to shield Vetter from litigation; and *fourth*, Regeneron only discovered documents establishing Vetter's role as co-

inventor because Novartis was compelled to disclose the information during discovery. These factors plausibly support estoppel. *Matter of Steyer*, 521 N.E.2d 429, 430 (N.Y. 1988); *Kamruddin v. Desmond*, 741 N.Y.S.2d 559 (2d Dep't 2002).

**B.** The district court disagreed because it believed Novartis's deception was aimed only at the "public" and Regeneron had "notice sufficient to call for further investigation into whether it had a tortious interference claim." SPA33-34. That was all incorrect. There is no "public deception" exception to estoppel and, regardless, the district court ignored the particular acts of concealment that were aimed at Regeneron. As for inquiry notice, Regeneron inquired about the license between Vetter and Novartis; but the court ignored that diligence and never explained what more Regeneron was required to do. Finally, the district court erred to the extent it found that Regeneron waived its equitable tolling argument as to its tortious interference claim because Regeneron clearly argued that "all" of its claims were timely and expressly quoted the applicable standard for tortious interference claims.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss *de novo* and without deference. *Anderson News*, 680 F.3d at 185. "In reviewing the complaint," the court "accept[s] as true the factual allegations" and "construe[s] all reasonable interferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Id.* (citation omitted). The complaint must be "read as a whole, rather than

piecemeal," and need only state a "plausible claim" for relief. *Id.* at 190 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Because plausibility is a standard lower than probability, a given set [of allegations] may well be subject to diverging interpretations, each of which is plausible"; but a court cannot "dismiss the complaint on the basis of the court's choice among [those] plausible alternatives." *Id.* at 184, 190.

## ARGUMENT

### I.    Regeneron Plausibly Alleged A Relevant Product Market

#### A.    Courts Hesitate To Dismiss For Failure To Plead A Relevant Market

An antitrust market's "outer boundaries" are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019) (quoting *Brown Shoe*, 370 U.S. at 325). "[T]wo products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand," such that "consumers would respond to a slight increase in the price of one product by switching to another product." *Todd*, 275 F.3d at 201-02. This Court implements that standard "by imagining that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ('SSNIP') within the proposed market. If the hypothetical monopolist can impose this SSNIP without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the

relevant market." *American Express Co.*, 838 F.3d at 199 (citing 2010 Horizontal Merger Guidelines § 4.1.1).

This Court has also recognized that, within a market's "outer boundaries," there can exist relevant markets, or "submarkets," which "in themselves, constitute product markets for antitrust purposes." *US Airways*, 938 F.3d at 64 (quoting *Brown Shoe*, 370 U.S. at 325). Submarkets are determined "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* (quoting *Brown Shoe*, 370 U.S. at 325). These indicia are "evidentiary proxies for direct proof of substitutability," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986), and therefore help to "clarify whether two products are … part of the same market." *Geneva Pharms.,* 386 F.3d at 496.

As these standards make clear, "the proper market definition" requires resolution of empirical questions that "can be determined *only after a factual inquiry* into the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (emphasis added); *Anderson News*, 680 F.3d at 185 ("Fact-specific questions cannot be resolved on the pleadings."). Indeed, market definition is often the subject of extensive economic expert discovery. *Colsa*

*Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998) ("construction of a relevant economic market … cannot be based on lay opinion"). That is why courts "hesitate to grant motions to dismiss for failure to plead a relevant product market." *US Airways*, 938 F.3d at 64. At the pleading stage, before a plaintiff can put on expert empirical evidence, the allegations need only (1) "bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes," and (2) include a "plausible explanation as to why a market should be limited" to exclude possible substitutes. *Todd*, 275 F.3d at 200.

**B.    Regeneron Adequately Pleaded A U.S. Market For FDA-Approved Anti-VEGF PFS Drugs**

Regeneron's detailed allegations easily surpass the above standards. The FAC specifically alleged a lack of cross-elasticity or reasonable interchangeability between PFS and vials, alleging repeatedly that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS." A419, CA86 (¶ 200); A428, CA95 (¶ 225); A431, CA98 (¶ 236); A439, CA106 (¶ 254). This is no bare conclusion: The FAC included a battery of specific facts that support the allegation, both individually and in the aggregate.

*First*, anti-VEGF PFS treatments have important practical and medical benefits that distinguish them from alternative treatment methods, including vials. The FAC addressed in detail—and distinguished—treatments other than FDA-approved anti-VEGF drugs, A358-360, CA25-27 (¶¶ 70-75), and Novartis did not

make more than a passing mention of these other treatments in its relevant market arguments. A151-154. And as compared to anti-VEGF vials, the key players in the industry—independent analysts, leading medical journals, and both sides in this litigation—have all hailed PFS as offering a "more safe, effective and efficient" method of administration than vials. A355, CA22 (¶ 62); A360-363, CA27-30 (¶¶ 76-84); A418-419, CA85-86 (¶¶ 197-198). PFS reduces the risk of endophthalmitis by fifty percent relative to vials, A362, CA29 (¶ 80); it offers a more accurate dose than vials by eliminating the need to manually withdrawing the liquid, A361, CA28 (¶ 79); A363, CA30 (¶ 84); and it reduces preparation time relative to vials by forty percent, as demonstrated in studies, which minimizes patient wait time and enables ophthalmologists to see additional patients throughout the day. A362, CA29 (¶ 80). Indeed, Novartis's own advertising materials highlight the convenience-based advantages of PFS over vials in vivid graphical terms:



A418, CA85 (¶ 197). As the graphic underscores, PFS allows the provider to skip right from step 1 of the injection process all the way to step 8. *Id.* As Regeneron

alleged, such shortcuts not only make PFS easier and quicker to administer, but "result in less exposure to potential contaminants that may cause adverse reactions or complications during injection." *Id.* These industry-recognized practical advantages establish that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS." A419, CA86 (¶ 200); *see also Brown Shoe*, 370 U.S. at 325. At the very least, they "bear a rational relation" to, and render plausible, the SSNIP allegation. *Todd*, 275 F.3d at 200.

*Second*, because of these advantages, doctors have converted their patients from vials to PFS in droves. *Supra* at 10, 24. When PFS versions of LUCENTIS and EYLEA each launched, more than 80% of the volume quickly converted from vials to PFS for each product. A363, CA30 (¶ 85); A364, CA31 (¶ 87); A419, CA86 (¶ 200). Precipitated by PFS's practical advantages, this massive one-way shift reveals a "strong preference" for PFS that too makes it at least plausible that "a small, but significant, price increase in the PFS version" would not cause physicians to switch to vials. A419, CA86 (¶ 200); *Lucas Auto. Eng'g, Inc. v. Bridgestone/ Firestone, Inc.*, 275 F.3d 762, 768 (9th Cir. 2001) (consumers' "very strong preference" for a particular product supported "a legitimate inference" against cross-elasticity).

*Third,* the FAC cited *direct evidence* that the PFS presentation enabled Novartis to grow market share and increase prices vis-à-vis vials. When LUCENTIS

PFS launched, it competed against EYLEA in vial form only. Novartis claimed at the time in statements to shareholders that PFS gave LUCENTIS a "competitive advantage." A363, CA30 (¶ 85). And, in its complaint against Regeneron in the Northern District of New York, Novartis admitted that the entry of EYLEA PFS led to a "loss of market share" and "price erosion," A425, CA92 (¶ 215), competitive pressures that LUCENTIS PFS did not face from vials alone. Surveyed doctors also confirmed that they would increase their use of EYLEA once it became available in PFS form. A419, CA86 (¶ 198). All of these real-world experiences show that EYLEA PFS "discipline[d] much more closely" Defendants' monopoly pricing power than vials ever could. PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 913 (2018) [hereinafter AREEDA & HOVENKAMP]. And they provide strong support for the FAC's allegation that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS." A419, CA86 (¶ 200).[9]

---

[9] That pricing allegation is especially powerful because, after all, "market definition simply serves as a surrogate for market power," which "may be proven *directly* by the evidence of the control of prices." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (citation omitted); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012) ("Plaintiffs' relevant market definition is not so implausible as to warrant dismissal, *especially where they plead Parnon's ability to control prices*."); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) ("direct proof of monopoly power does not require a definition of the relevant market").

*Fourth*, the FAC explained that anti-VEGF "PFS requires unique production facilities and capabilities that are distinct from those required to manufacture anti-VEGF vials … as well as separate regulatory approval." A419, CA86 (¶ 199); *Brown Shoe*, 370 U.S. at 325 (recognizing "unique production facilities" among relevant practical indicia for market definition). Regeneron and Novartis invested in these unique and costly regulatory and production processes because both companies believed (correctly) that PFS generate profits by appealing to doctors and patients in a way that existing products, like vials, did not. These practical indicia—coupled with all of the other *Brown Shoe* factors discussed above (including "industry recognition," "peculiar characteristics," and "sensitivity to price changes")—independently suffice to establish a PFS-only market under controlling precedent. *See Geneva Pharms.,* 386 F.3d at 495. In addition, they plausibly suggest that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS." A419, CA86 (¶ 200); *Brown Shoe*, 370 U.S. at 325.

\* \* \*

In an area where courts are especially "hesitat[ant] to grant motions to dismiss," *US Airways*, 938 F.3d at 64, Regeneron's detailed allegations easily pass muster. This is not a close call. Indeed, antitrust plaintiffs regularly survive the motion to dismiss with market allegations far less specific and detailed than the ones

Regeneron presented here.[10] And this Court does not hesitate to reverse on market definition when a district court oversteps its bounds at the pleading stage, as the district court did here. *E.g.*, *US Airways*, 938 F.3d at 64; *Todd*, 275 F.3d at 206. In practice, the rare case in which dismissal on the pleadings is appropriate "involve[s] either (1) [a] failed attempt[] to limit a product market to a single brand … that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id.* at 200.[11]

---

[10] In *Wacker v. JP Morgan Chase*, for example, allegations describing a defendant's "ability to control silver future prices" were alone sufficient at the pleading stage "[b]ecause market definition is a deeply fact-intensive inquiry." 678 F. App'x 27, 30-31 (2d Cir. 2017); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 225-227 (S.D.N.Y. 2019) (plaintiff "sufficiently pled a market for Single Serve Brewers" based solely on "functionality and consumer perspective"); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 247 (D. Conn. 2015) (narrow drug market was "highly plausible" because, "[i]f that were not the case, it is not clear why [defendant] would have sued to prevent entry of [a] generic."); *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183-TC, 2018 WL 2271024, at *8 (D. Utah May 17, 2018) (crediting *Brown Shoe* factors and explaining that, "[a]lthough [the complaint] simply [provides] a recitation of the economic SSNIP test, the court may not expect anything more from Plaintiffs short of an economic analysis, which is not suitable in a complaint."); *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-2680 (AJN), 2014 WL 4988268, at *13 (S.D.N.Y. Sept. 29, 2014) (Nathan, J.) (same).

[11] *See, e.g.*, *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (dismissal on market definition for failure to even "address any specific drug or treatment" alternatives); *cf. Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming summary judgment for defendant on market definition where plaintiff failed, even after discovery, to "offer[] any theoretically reasonable explanation for restricting the product market.").

Regeneron's detailed allegations avoid those "obvious oversights." *Lifewatch Services Inc. v. Highmark Inc.*902 F.3d 323, 337 (3d Cir. 2018). The proposed market includes *both* EYLEA PFS and LUCENTIS PFS (more than a single brand), and the FAC included detailed allegations explaining why vials are not sufficiently cross-elastic with PFS, such that anti-VEGF PFS make up their own market. A417-419, CA84-86 (¶¶ 196-198); *supra* at 29.

## C.    The District Court Erred In Dismissing A PFS-Only Market

The district court found no separate market for PFS because it refused to credit Regeneron's plausible allegations. The court dismissed Regeneron's proposed market as "strange," and worried that it would "immediately confer complete monopoly power to the inventor" of any patent. SPA25-26. Those abstract concerns were misconceived and unsupported. And none can excuse the court's failure to engage meaningfully with the FAC's allegations.

### 1.    The District Court Impermissibly Dismissed Or Ignored Key Allegations

The district court recited Regeneron's allegation that a SSNIP for PFS would not cause substitution to vials or other products, SPA24-25, but it never engaged with the SSNIP test and simply ignored or disputed the allegations that specifically support that critical allegation.

***Practical and medical advantages***. The district court recognized that PFS has "performance-based advantages over their counterparts in vials because they are

quicker, easier, and safer." SPA24. But it nonetheless decided that PFS was only "marginally superior to the vial," SPA28, even though the phrase "marginally superior" appears nowhere in the operative pleading or even Defendants' briefs.

That was error on multiple levels. First, the test for market definition is not whether a particular judge decides, in connection with a motion to dismiss and without any basis in the pleading, that one product is only "marginally superior" to another, or whether consumers remain "free to choose between a vial or PFS delivery system" such that they *could* switch. SPA27. The question instead is how *consumers* behave—and whether the complaint plausibly alleges that market actors *would* switch to vials after a small but substantial increase in the price of PFS. *Supra* at 23, 31. That intensely fact-bound inquiry turns invariably upon an "empirical analysis of consumer preferences," *United States v. Visa U.S.A*, 344 F.3d 229, 239 (2d Cir. 2003), not a particular judge's speculation (without the benefit of discovery, deposition testimony, or expert reports). That is precisely why courts are so "hesita[nt] to grant motions to dismiss for failure to plead a relevant product market." *US Airways*, 938 F.3d at 64.

Second, what matters at the pleading stage is what the complaint alleges, drawing all reasonable inferences in the plaintiff's favor. Contrary to the district court's characterization, the FAC alleged that the market views PFS as having *substantial* (*non-marginal*) benefits over vials. Leading journals describe PFS as "*a*

*boon to patients* … and retinal physicians because of the decreased endophthalmitis risk, dose accuracy, and improved clinic efficiency they can provide." A361, CA28 (¶ 78) (emphasis added). And even Novartis has claimed that PFS "permit[s] more safe, effective and efficient injections of VEGF-antagonists into the eye," in a way that "mitigates the problems associated with vials." A362, CA29 (¶ 82); A417, CA84 (¶ 196). The district court had no mandate, especially at the pleading stage, to impose its own views on the market or to presume, contrary to the FAC's detailed allegations, that the market views the benefits of PFS as merely "marginal." Regeneron was entitled to every reasonable inference, including—as specifically alleged—that the relevant market participants view the health, efficacy, and efficiency benefits of PFS over vials as meaningful rather than marginal.

**The massive one-way shift to PFS.** The FAC further explained that these meaningful benefits have caused doctors to convert their patients, quickly and in droves, from vials to PFS. *Supra* at 10, 24. As alleged in the FAC, this shift "demonstrate[s] [a] strong [physician] preference for PFS over vials," and thus shows that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS." A419, CA86 (¶ 200).

Addressing this powerful allegation only in a conclusory footnote, the district court dismissed the one-way shift, hypothesizing—without any support—that physicians could simply "switch back to their vials" if the price of PFS went up

"beyond a 'small'" amount. SPA28 n.6. That was another egregious error. Again, the district court was required to "construe the complaint in the light most favorable to [Regeneron]." *Todd*, 275 F.3d at 197. But the district court did exactly the opposite. The speed and magnitude of the market shift from vials to PFS underscores a meaningful market preference, and for that reason the FAC specifically alleged that doctors would *not* simply "switch [their patients] back" to vials in the event of a small, but significant, price increase. A419, CA86 (¶ 200). The district not only ignored that allegation, but—based on nothing but its own pure speculation—adopted the contrary inference, simply stipulating that patients would "shift back" to vials despite the documented advantages of PFS over vials.

The district court's view is unreasonable on its face for all of the reasons discussed above. But even if the facts were "subject to diverging interpretations," the district court still had no mandate "to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Anderson News*, 680 F.3d at 190.[12]

---

[12] The Court purported to draw support from *City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). *Group Health* not only was decided on *summary judgment*, but it fits neatly in *Todd*'s second box: it held that "the market alleged in the … complaint is legally insufficient because it is [not] defined … according to the rule of reasonable interchangeability and cross-elasticity of demand." *Id.* at 156. By contrast, Regeneron's FAC explained at length why a small, but significant, increase for PFS would not cause a shift to vials. A419, CA86 (¶ 200).

***Direct evidence of PFS pricing power.*** The district court never addressed Novartis's statements, quoted verbatim in the FAC, that the introduction of the PFS presentation increased LUCENTIS's market share, A363, CA30 (¶ 85), and that the entry of EYLEA PFS caused "price erosion" on LUCENTIS PFS, in a way that vials alone did not. A425, CA92 (¶ 215); A429, CA96 (¶ 229); A436, CA103 (¶ 245); A445, CA112 (¶ 268). The district court's failure to address those specific and powerful allegations was reversible error. *Anderson News*, 680 F.3d at 184, 190.[13]

***Additional* Brown Shoe *Indicia.*** The district court acknowledged Regeneron's allegation that PFS and vials require different manufacturing equipment. SPA24. But the court dismissed that allegation as well, on the theory that it supposedly "says nothing about whether a consumer would find a vial and PFS interchangeable." SPA25. That, too, was reversible error.

In *Brown Shoe*, the Supreme Court held that "unique production" facilities are among the practical indicia that bear upon a market's scope. *Brown Shoe*, 370 U.S. at 325; *e.g.*, *US Airways*, 938 F.3d at 64; *Geneva Pharms.*, 386 F.3d at 495 (applying *Brown Shoe* factors and regulatory approvals to conclude generic and branded versions of the same active ingredient constitute separate markets). The district court

---

[13] The district court stated that it would not rely upon the complaint in the patent case when deciding the motions to dismiss the antitrust complaint. SPA11 n.2. Where the FAC quoted statements directly from the patent complaint, however (*e.g.*, A425, CA92 (¶ 215)), the district court could not ignore those allegations.

had no authority to ignore those controlling precedents, even if it disagreed with them.

In any event, the precedents are right. A product's "unique production facilities … go[] directly to the economic criteria that makes one market distinct from another" because it points to entry barriers that allow a monopolist to raise "price[s] above the competitive level." *Rothery Storage*, 792 F.2d at 219 n.4. In addition, as explained above (*supra* at 33), a sophisticated company's willingness to invest in "unique production facilities" often reflects a considered judgment—based on information not available to a court at the pleading stage—that the product at issue has sufficient market demand to warrant a high level of investment. And sophisticated "economic actors usually have accurate perceptions of economic realities." *Id.*; *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J. Op.). That is surely what happened here, when Regeneron and Novartis each embarked upon costly and lengthy collaborations with Vetter to commercialize their respective PFS products. The district court's brazen decision to ignore those market realities, in the face of *contrary Supreme Court precedent*, cannot be allowed to stand.

Courts "often look at 'practical indicia' to determine the boundaries of a relevant market" at the pleading stage precisely because "hard data on cross-elasticity of demand are rare." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306

F. Supp. 3d 610, 619 (S.D.N.Y. 2018). The district court's rejection of practical indicia—it never even cited *Brown Shoe*—flouts that evidentiary reality. And the court's approach is especially dangerous for industries like this one where pricing and other market data are often not publicly available, forcing plaintiffs to rely upon the objectively discernable factors described in *Brown Shoe* to plead a relevant market.[14]

* * *

Each of the abovementioned errors, standing alone, warrants reversal; collectively, they mandate it. Under this Court's precedents, the district court was required to "read [the FAC] as a whole, rather than piecemeal," and assess the market's plausibility based on the sum total of Regeneron's mutually reinforcing allegations. *Anderson News*, 680 F.3d at 189. But the district court never did that. Instead, it took a perfunctory and balkanized view of the relevant evidence, never pausing to consider whether Regeneron's careful assemblage of detailed factual allegations (from the practical advantages and the massive patient shift, to the direct

---

[14] *See* Michael S. Sinha, et al., *Antitrust, Market Exclusivity, and Transparency in the Pharmaceutical Industry*, 319 AM. MED. ASS'N 2271, 2271 (2018) (explaining that "rebates and bundling remain obscured under confidential agreements that are not readily accessible, even to affected parties such as public payers and patients."). Indeed, a plaintiff is often forced to bring a *Walker Process* suit before pricing data is even available, because the defendant has sued for patent infringement soon after plaintiff's product has launched.

pricing evidence and the unique levels of investment) might plausibly suggest a separate PFS market. That, too, was reversible error.

### 2. The District Court Erred In Applying A Heightened Pleading Standard To Markets Coextensive With Patent Claims

The district court's rejection of the well-pleaded market definition allegations was driven by another independent legal error: the court's belief that a relevant product market cannot be coextensive with the scope of a patent. SPA25-27. According to the district court, if a relevant market were the same as what a patent claims, then "every instance of patent fraud would give rise to an antitrust claim by definition." *Id.* To avoid that outcome, the court thought it should set aside the standard tools of market definition—including the SSNIP test (*see* SPA24-25)—and instead require that the market-defining products be "so novel that there really is no fitting substitute" for their patented technology. SPA27.

The district court's invented rule has no basis in law or logic. The court cited *no authority* to support that heightened standard, a rule not even Defendants advanced below. The leading decisions make clear that, even when a patent is involved, the antitrust question should be answered "by considering *traditional antitrust factors*." *Actavis*, 570 U.S. at 149 (emphasis added). In other words, there are no special rules for market definition in patent cases; the standard analyses apply regardless of whether the asserted market happens to be coextensive with what a

patent claims. AREEDA & HOVENKAMP ¶ 518a ("Of course, a patented product and the relevant market may be coterminous."). Applying standard market-definition tools does not mean that every patent confers monopoly power, as the district court erroneously stated. SPA26. It just means that courts should be guided by the same principles they use to evaluate proposed markets in every case. If a market that is coextensive with a patent is appropriately defined according to the principles of "reasonable interchangeability of use or the cross-elasticity of demand," *US Airways*, 938 F.3d at 64, it is a proper antitrust market.

*Walker Process* itself illustrates the point. The asserted market there was coextensive with the patent: the market covered "knee-action swing diffusers," which was the same technology claimed by the relevant patent. *See Walker Process*, 382 U.S. at 177-78.[15] Nonetheless, the case was allowed to proceed according to standard antitrust analysis. *See id.* (remanding for fact-finding and noting that the

---

[15] Indeed, it is not unusual for relevant markets in *Walker Process* cases to be coextensive with patent claims. *See, e.g.*, *Transweb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016) (upholding jury's finding, in a *Walker Process* case, of a market for "Plasma-fluorinated filter media"—a product manufactured only by Transweb and 3M—based on a patent roughly coterminous with the market); *see also Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1350 (Fed. Cir. 2007) (*Walker Process* claim arose from a single patent covering *two different markets* all by itself); *Avent, Inc. v. Motio, Inc.*, No. 12 C 2100, 2015 WL 425442, *3 (N.D. Ill. Jan 30, 2015) (*Walker Process* case where patent coextensive with alleged market); *Nalco Co. v. Turner Designs, Inc.*, No. 13–cv–02727 NC, 2014 WL 645365, *8 (N.D. Cal. Feb. 19 2014) (same).

suit was not dismissed for "fail[ure] to allege the relevant market."). And while the district court below thought that its rule was necessary to preserve the "*Walker Process* framework," SPA27, it is the district court's rule that actually does damage to the doctrine. In addition to fraud on the PTO, *Walker Process* plaintiffs must allege all of the other elements of Sherman Act claim. *See Walker Process*, 382 U.S. at 174; *Transweb*, 812 F.3d at 1305-1307. But they are not required to allege anything *more*. The district court's rule would erroneously do just that, raising the pleading burden for *Walker Process* plaintiffs contrary to longstanding antitrust principles. *See Wacker v. JP Morgan Chase & Co.*, 678 Fed. App'x 27, (2d Cir. 2017) ("[T]here is no heightened pleading standard in antitrust cases[.]").

To be sure, a "naked assertion" that the patent alone defines a relevant market is not itself enough. *See, e.g.*, *Delano Farms v. Cal. Table Grape Com'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011).[16] But that is not what Regeneron alleged here. Rather, Regeneron alleged a market for anti-VEGF PFS based entirely on the market realities *independent* of patent protection.[17] *Supra* at 27-42. "It is the [market

---

[16] The district court cited *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1298 (Fed. Cir. 2002), to support its *sui generis* market-definition rule, SPA27, but that case involved a tying arrangement and did not address market definition. *Id.* at 1297.

[17] In any event, the patent and the proposed market here *are not coextensive*. The patent's claims are highly specific, covering only anti-VEGF in a PFS subject to several technical specifications. A905. Regeneron's proposed market definition, by

reality]—not the mere issuance of a patent—that makes the scope of the relevant market [arguably] congruent with that of the patent" in this case. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007). The district court erred in conflating alleging a market *because of* patent protection with alleging a market where the market and the patent happen to coincide.

The district court was additionally mistaken in assuming that "plaintiffs could never fail to plead out an antitrust claim against a patent owner so long as they raised a colorable challenge to the patent's *validity*." SPA26. The allegations here are not merely that the patent is invalid, but rather that Defendants secured the patent through *fraud*. Indeed, Defendants *never challenged* the sufficiency of Regeneron's allegations of fraud based on the withholding of prior art, and the district court *never questioned* the sufficiency of the pleadings with respect to the substance of the inventorship fraud. That fraudulent activity—and not merely the patent's invalidity—is what gives rise to the antitrust *Walker Process* claim.

The district court's rule would also have dire policy consequences if it were allowed to stand. Rejecting antitrust markets simply because they are coextensive with patent claims would substantially hinder antitrust enforcement, especially in the pharmaceutical industry and other sectors where *Walker Process* claims

---

contrast, was based not on scientific technicalities, but on cross-elasticity of demand and real-world market dynamics. A415-420, CA82-87 (¶¶ 191-202).

frequently arise. It would upset the careful balance between encouraging innovation and protecting competition, and reward inequitable conduct in the patent system to the detriment of public health. As both this Court and the Federal Circuit have recognized, "intellectual property rights do not confer a privilege to violate the antitrust laws." *New York ex rel. Scheiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *In re Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1325 (Fed.Cir.2000)). "That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001) (*en banc*).

### 3. Products With Like Functions Commonly Exist In Separate Markets

Finally, the district court thought it "strange" that two products containing the same drug would exist in separate markets. SPA24. That skepticism was misplaced. Market definition turns upon empirical and economic questions that rarely, if ever, can be decided on the basis of raw judicial intuition. Indeed, courts have repeatedly recognized that even "functionally similar products may be in separate product markets, depending on the facts of the case." *F.T.C. v. Lundbeck*, 650 F.3d 1236, 1241 (8th Cir. 2011).

This Court's cases perfectly illustrate that trend. The Court has held, among other things, that: (1) generic and branded versions of *the exact same active ingredient* may exist in separate markets, *Geneva Pharms.,* 386 F.3d 485; (2)

"western world" gold existed in a market separate from "eastern bloc gold," *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 260-61 (2d Cir. 1989); and (3) the credit card market does not include other transaction-facilitating payment methods, *Visa U.S.A*, 344 F.3d at 239. None of this is unusual in the realm of antitrust law. *See, e.g.*, *AbbVie*, 976 F.3d at 373 (finding separate markets for injectable and topical therapies that treat the same condition).[18]

To the contrary, the leading antitrust treatise writers have given products with like functions existing in different markets a special name: "imperfect substitutes." Imperfect substitutes products that often look similar to the monopoly product or accomplish the same goal, but are still differentiated in ways that consumers deem significant. AREEDA & HOVENKAMP ¶ 1142. "To the extent a particular firm's offerings are imperfect substitutes," the treatise writers advise, courts "should *err in the direction of excluding them rather than including them*." *Id.* ¶ 536 (emphasis

---

[18] *See also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 996 (11th Cir. 1993) (excluding functionally interchangeable products from the market where the "record provides no support for finding significant cross-elasticity of demand or supply between Danforths and generic anchors"); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 (8th Cir. 1988) (sugar and high fructose corn syrup were separate product markets because "a small change in the price of [one] would have little or no effect on the demand for [the other]"); *United Food & Com. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1172 (N.D. Cal. 2017) ("Consistent with the bulk of the case law, something *more* than mere therapeutic equivalency is required to define the relevant antitrust product market."); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 158 (D.D.C. 2000) ("Finding two products to be functionally interchangeable, however, does not end the analysis.").

added). As the Supreme Court has explained, "For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn *narrowly*." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) (emphasis added). Otherwise, courts risk doing precisely what the district court did here: underestimating a defendant's market power and immunizing their anticompetitive conduct from judicial scrutiny. *Id.*; *accord* Merger Guidelines § 4.

\* \* \*

In short, Regeneron's complaint did what complaints are supposed to do: it asserted detailed factual allegations supporting a plausible market for anti-VEGF PFS that does not include vials. That is enough for Regeneron's claims to advance past the pleading stage, and Regeneron should have had the opportunity to prove them through fact and expert discovery. But the district court's contrary view predetermined these issues at the starting gate, based on impermissible inferences against the FAC and a novel legal rule against markets coextensive with patents that has no basis in law, precedent or logic. This Court should reverse.

## II. Regeneron's Tortious Interference Claim Was Timely

Regeneron's complaint also sufficiently alleged a claim for tortious interference with contract against Novartis. Under New York law, a plaintiff claiming tortious interference must show that the defendant knew of an agreement

between the plaintiff and a third party and procured the third party's breach of that agreement "without justification." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-127 (2d Cir. 2019). Regeneron alleged that Novartis knew that Regeneron had ownership rights in the '631 Patent by virtue of Regeneron's pre-existing PFS development agreement with Vetter, and it conspired with Vetter to deny Regeneron those rights by concealing Vetter's significant contributions to the patent.

The statute of limitations for tortious interference is three years, running from when "all elements of the tort can be truthfully alleged in a complaint." *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993); *Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) (citing N.Y. C.P.L.R. § 214(4)). In this case, the district court found that the tortious interference accrued in 2015 when the patent was issued to Novartis—without including Vetter employees as inventors—and not assigned to Regeneron in breach of its PFS development agreement with Vetter. SPA31; A451-453, CA118-120 (¶¶ 285-291); A403, CA70 (¶ 165). Because Novartis actively concealed the inventorship fraud until discovery in this litigation, A410-411, CA77-78 (¶¶ 179-180); A451-453, CA118-120 (¶¶ 285-291), estoppel applies and the district court was wrong to dismiss the claim on timeliness grounds.

### A. Regeneron's Allegations Establish Equitable Estoppel

"[Equitable estoppel]—rooted in the principle that one may not take advantage of one's own wrongdoing—operates to bar a party from asserting the

Statute of Limitations when that party's own wrongful concealment has engendered the delay." *Matter of Steyer*, 521 N.E.2d at 430. That doctrine applies if the plaintiff can show "*some conduct* on the part of the defendant after the initial wrongdoing" to conceal the fraud. *Ross v. Louise Wise Services, Inc.*, 868 N.E.2d 189, 198 (N.Y. 2007) (emphasis added). That "some conduct" standard is satisfied whenever the defendant refuses to respond to a plaintiff's pointed efforts "to elicit the facts." *Matter of Steyer*, 521 N.E.2d at 430.[19] That inquiry is highly fact-intensive, and it is often "not possible or appropriate" to decide on the pleadings whether a plaintiff has exercised sufficient "due diligence" for estoppel to apply. *Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 200 (2d Cir. 1991) (quoting *Simcuski v. Saeli*, 44 N.Y.2d 442, 450 (1978)).

The FAC included multiple separate and specific allegations of fraudulent concealment, each of which is sufficient to estop Novartis from asserting a limitations defense.

*First*, Novartis purchased Vetter's silence and complicity by offering Vetter ██████████████████████████████ and a co-exclusive license over the patent with the right to sub-license. A403, CA70 (¶ 165). ████████████████

---

[19] *See Kamruddin,* 741 N.Y.S.2d at 560-61 (equitable estoppel applied when "the plaintiff demanded copies of his medical records from the [defendants]" and "[h]is requests went unanswered until the plaintiff sought court intervention").

was the *quid pro quo* through which Novartis ensured Vetter's continued silence. A403, CA70 (¶ 165); A449, CA116 (¶ 280). Novartis should be estopped from asserting the statute of limitations against Regeneron for as long as it purchased Vetter's complicity and silence in the fraud.

*Second*, between at least October 2013 and August 2014, and again in October 2017, Regeneron specifically and repeatedly asked Vetter about the nature of its agreement with Novartis. A410, CA77 (¶ 179); A447, CA114 (¶ 273). Each time, Vetter—acting pursuant to its anticompetitive agreement with Novartis—refused to disclose the details or produce an original copy of the 2013 Amendment, which would have exposed Vetter's role as a "substantial contributor" to the patent. A341, CA8 (¶ 13); A342, CA9 (¶ 15); A410, CA77 (¶ 179); A432, CA99 (¶ 239); A440, CA107 (¶ 258); A447, CA114 (¶ 273); CA231; SPA7. In other words, the Defendants "remained silent … and concealed their own wrongdoing by failing to respond when [Regeneron] attempted specifically to elicit the facts from them"—a course of conduct sufficient to establish equitable estoppel under controlling precedent. *Matter of Steyer*, 521 N.E.2d at 430; *Langston v. MFM Contr. Corp.*, 102 N.Y.S.3d 12, 13 (1st Dep't 2019) ("[E]vasiveness in response to plaintiffs' requests for information … is an affirmative act of concealment that could give rise to equitable estoppel.").

*Third*, Novartis further concealed the fraud in December 2019 by transferring to itself exclusive enforcement authority over the patent. A413, CA80 (¶ 186); SPA11. That maneuver allowed Novartis to sue Regeneron on the patent without also disclosing Vetter's role as a co-inventor. A414, CA81 (¶ 187). Here, too, Novartis bought Vetter's complicity by agreeing to give Vetter a much greater share of monies it could obtain from Regeneron in its wrongful infringement actions based on the fraudulently procured '631 Patent.

*Fourth*, Regeneron was only able to discover Vetter's role as co-inventor in 2020 because Novartis was compelled to disclose the information during discovery in litigation. A337, CA4 (¶ 9 n.5); A410, CA77 (¶ 179 n.68). The fact that Regeneron's "requests went unanswered until [it] sought court intervention"—and that judicial intervention was *required* to bring out the truth of the matter—only further underscores Novartis's successful efforts at active concealment. *Kamruddin*, 741 N.Y.S.2d at 561.

### B. The District Court's Reasons For Failing To Apply Equitable Estoppel Are Factually And Legally Wrong

The district court declined to apply equitable estoppel because it believed Novartis's deception was aimed only at the "public" and that Regeneron had "notice sufficient to call for further investigation into whether it had a tortious interference claim." SPA33-34. Both theories suffer from fatal defects, which is why Novartis raised neither of them below.

### 1. The Fraud Was Targeted At Regeneron

The district court thought equitable estoppel should not apply because Novartis's "public" deception "was not tailored to prevent Regeneron from bringing a suit, but instead [was designed] to secure an advantageous patent for Novartis." SPA32-33. That is incorrect for a few reasons.

As an initial matter, New York courts have never endorsed the rule that a defendant can avoid equitable estoppel by deceiving the public in addition to the plaintiff. To uncover such a rule, the district court relied exclusively upon another federal district court decision that arose in an entirely different factual context, *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014), which in turn relied exclusively upon an *unpublished* federal district court decision, *Doe v. Kolko,* 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008). *Kolko* did not cite *any authority*—state or federal—to support its view, and as of the submission of this brief, no New York court has cited either *Twersky* or *Kolko* even once. The district court thus invented a new rule of state law to dispose of Regeneron's allegation.

But even if such a rule existed, it would not control the outcome here. As already explained, equitable estoppel applies in this case because Novartis directed its fraudulent concealment at Regeneron specifically: (1) Novartis and Vetter *rebuffed Regeneron* when it inquired about Vetter's role, as part of their conspiracy to *block Regeneron* from securing rights in their patent; and (2) Novartis transferred

to itself sole enforcement rights in the patent specifically to *sue Regeneron*, without disclosing Vetter's role. *Supra* at 25. Those actions—like the rest of Defendants' fraudulent scheme—were plainly calculated to deprive Regeneron of its contractual rights and prevent it from bringing suit.

The district court ignored these highly targeted allegations because it assumed, incorrectly, that only two possibilities existed: Either Novartis intended to deceive the public at large, *or* Novartis intended to deceive Regeneron. SPA32-33. But that is a false dichotomy. Novartis deceived the PTO (and the broader public), for at least the specific purpose of depriving *Regeneron* of its property rights, forcing *EYLEA PFS* from the market, and preventing *Regeneron* from bringing suit to challenge the patent. Though Novartis deceived the public as well, the entire scheme was calculated, at least in part, to deprive Regeneron of its property rights and to prevent Regeneron from bringing suit.

The district court's lone authority, *Twersky*, is not to the contrary. 993 F. Supp. 2d at 442. *Twersky* involved a lawsuit by abuse victims against the alleged abuser's employer. The court rejected claims that the employer's statements to the community defending the alleged abuser supported an equitable estoppel defense because "there [was] nothing about the general statements to the community that prevented the plaintiffs from knowing that they were abused, who had abused them, and who employed their abusers." *Id.* at 445 n.6. In other words, the plaintiffs knew

everything they needed to know to sue, and nothing in the defendant's allegedly false public statements suggested otherwise. Hence, the employer's public statements defending the alleged abuser as a person of "strong moral character" were calculated, not to conceal any wrongdoing from the Plaintiffs, but instead to defend the employer's and the accused's reputations. *Id.* at 444-45.

This case is the opposite: Regeneron alleged that it could not know that it was being deprived of its rights under its PFS development agreement with Vetter precisely because Novartis actively concealed Vetter's inventorship. A413-414, CA80-81 (¶¶ 186-187); A450, CA117 (¶ 283); A453, CA120 (¶ 292). That deception was clearly calculated to deprive *Regeneron* specifically of its potential property right in the '631 Patent. *Supra* at 25.

## 2.      Regeneron Exercised Reasonable Diligence

The district court also believed that Regeneron had "notice sufficient to call for further investigation into whether it had a tortious interference claim." SPA33-34. Yet again, the court failed to contend with the FAC's actual allegations. The FAC alleged that Regeneron took specific steps, in "the exercise of reasonable diligence," to uncover the truth about Vetter's and Novartis's relationship, A453, CA120 (¶ 292): on at least three separate occasions, Regeneron made pointed requests to see copies of Vetter's agreement with Novartis, but was rebuffed each time, pursuant to Defendants' conspiracy. *Supra* at 53.

The district court never acknowledged that diligence. Instead, it simply declared that Regeneron should have "investigated further." But the court never says what else Regeneron could or should have done to secure information solely in the Defendants' possession and which Defendants were determined to keep secret. "To impose an obligation on the plaintiff to blindly proceed in face of [the defendant's] intentional concealment would allow the wrongdoer to chart the course of the proceedings, and ultimately to profit from his or her own wrongdoing." *Kamruddin*, 741 N.Y.S.2d at 562. Regeneron satisfied its obligations when it "attempted specifically to elicit the facts from [defendants]." *Matter of Steyer*, 521 N.E.2d at 430.[20] To require anything more would spawn satellite litigation in which plaintiffs would be forced to sue before they even had the facts to state a claim.

The district court thought it could evade all of the relevant allegations because it had discerned an internal contradiction in Regeneron's allegations. SPA33-34. The court reasoned that if Regeneron could impute to Novartis knowledge of Regeneron's PFS development agreement with Vetter based on industry customs,

---

[20] *Cf. Schenker AG v. Societe Air France*, 102 F. Supp. 3d 418, 426 (E.D.N.Y. 2015) ("Courts within the Second Circuit have held that plaintiffs are not required to allege affirmative inquiries when such inquiries would be futile … because of the affirmative, deceptive practices and techniques of secrecy employed by Defendants.").

then, based on those same customs, Regeneron should have known about the 2013 Amendment, which recognized Vetter's contributions to the invention. SPA34-35.

That argument fails because the underlying allegations concern two completely different classes of contractual provisions. The FAC imputes to Novartis knowledge of an industry-standard term for allocating rights between suppliers and developers in the pharmaceutical industry: in joint development efforts, the supplier secures in advance rights in the intellectual property to which the developer may contribute. A403, CA70 (¶ 164). But the relevant provision in the 2013 Amendment is an entirely different kind of provision and is not industry-standard: the 2013 Amendment was designed to *settle a dispute* over a collaboration that should never have occurred in the first place, and it was executed as part of scheme to block Regeneron from the PFS market. A339, CA6 (¶ 11). There is nothing "common" about the highly idiosyncratic and anti-competitive agreement between Novartis and Vetter. Regeneron was entitled to "all reasonable inferences," *Anderson News*, 680 F.3d at 185, yet the district court never tried to explain why Regeneron should have known what the agreement said or been able to secure the agreement by any means other than a discovery subpoena in litigation.[21]

---

[21] Novartis and Vetter never raised this "most damning" contradiction—another sign that the district court overstepped in its analysis.

### 3. Regeneron Preserved Its Estoppel Defense

The district court stated that Regeneron "spent not a single word defending its tortious interference claim," which would "justify dismissal on its own." SPA 31. But that description distorts the relevant procedural history.

*First*, Regeneron clearly argued that "*all* of its claims are timely," A554, CA214, and it specifically quoted, at full length, the operative standards for "asserting fraudulent concealment as a basis for equitable tolling" of the limitations period on its "tortious interference claim." A558 n.32, CA218 n.32. Regeneron further explained that it "diligently tried to uncover Defendants' unlawful conduct by requesting information about their agreements," but that Novartis's fraudulent concealment of its agreements with Vetter barred application of the limitations period. A557-559, CA217-219. Accordingly, the district court's assessment that Regeneron "spent not a single word" on the timeliness of its tortious interference claim is simply incorrect.

*Second,* the district court faulted Regeneron for "using the language employed in antitrust claims" to frame its discussion of Novartis's "fraudulent concealment" with respect to the tortious interference claim. SPA32 n.9. This elevates form over substance. Both this Court and the New York Court of Appeals have described "fraudulent concealment" as a ground "to merit equitable estoppel." *Horn v. Politopoulos*, 628 F. App'x 33, 34 (2d Cir. 2015); *Florio v. Cook*, 399 N.E.2d 947,

947 (N.Y. 1979) ("equitable estoppel … must also be rejected, as neither fraud nor *fraudulent concealment* was pleaded" (emphasis added)). Regeneron therefore reasonably framed its allegations and arguments on timeliness of its tortious interference claim around Novartis's ongoing "fraudulent concealment" of the core inventorship deception. A409-411, CA76-78 (¶¶ 178-180); A557-560, CA217-220.

\* \* \*

The FAC outlines the myriad strategies employed by Novartis to conceal its inventorship fraud from Regeneron: Novartis purchased Vetter's ongoing silence through ███████████████, Vetter repeatedly honored the agreement by actively rebuffing Regeneron's requests for further information, and Novartis manipulated the litigation process repeatedly to keep Vetter's role secret. All of that was sufficient to plead equitable estoppel, and the district court was wrong to conclude otherwise.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court.

Dated: New York, New York
June 10, 2022

Respectfully submitted,

/s/Adam B. Banks
Adam B. Banks
Elizabeth S. Weiswasser
Eric S. Hochstadt
Anish Desai
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Joshua Halpern
**WEIL, GOTSHAL & MANGES LLP**
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) and the word limit of Local Rule 32.1(a)(4)(A) because it contains 13,990 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
      June 10, 2022

                */s/Adam B. Banks*
                Adam B. Banks
                Elizabeth S. Weiswasser
                Eric S. Hochstadt
                Anish Desai
                **WEIL, GOTSHAL & MANGES LLP**
                767 Fifth Avenue
                New York, New York 10153-0119
                Telephone: (212) 310-8000
                Fax: (212) 310-8007

                Joshua Halpern
                **WEIL, GOTSHAL & MANGES LLP**
                2001 M Street NW, Suite 600
                Washington, DC 20036
                Telephone: (202) 682-7000
                Fax: (202) 857-0940

                *Counsel for Plaintiff-Appellant*