# 22-0427-cv

REGENERON PHARMACEUTICALS, INC.,
*Plaintiff-Appellant,*

v.

NOVARTIS PHARMA AG, NOVARTIS TECHNOLOGY LLC, NOVARTIS PHARMA-
CEUTICALS CORPORATION, VETTER PHARMA INTERNATIONAL GMBH,
*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

_____

## BRIEF OF DEFENDANTS-APPELLEES
## (REDACTED)

*Designated counsel listed on next page*

BENJAMIN T. HORTON
JULIANNE M. HARTZELL
MARSHALL GERSTEIN & BORUN
LLP
6300 Willis Tower
233 South Wacker Drive
Chicago, IL 60606

*Attorneys for Appellee Vetter
Pharma International GmbH*

IAN SIMMONS
*Counsel of Record*
BENJAMIN G. BRADSHAW
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

LISA PENSABENE
O'MELVENY & MYERS LLP
7 Times Square Tower
New York, NY 10036

STEPHEN J. MCINTYRE
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071

MELISSA C. CASSEL
O'MELVENY & MYERS LLP
2 Embarcadero Center
San Francisco, CA 94111

*Attorneys for Appellees Novartis Pharma AG, Novartis Technology LLC, and Novartis Pharmaceuticals Corp.*

*(Additional counsel listed on signature page)*

# CORPORATE DISCLOSURE STATEMENT

Novartis Pharma AG, Novartis Pharmaceuticals Corporation, and Novartis Technology LLC are indirect, wholly owned subsidiaries of Novartis AG. No publicly held corporation owns more than 10% of the stock of Novartis AG.

Vetter Pharma International GmbH is a privately held German company. It is a wholly owned subsidiary of Vetter Pharma-Fertigung GmbH & Co. KG, a privately held Germany company. No publicly held corporation owns more than 10% of the stock of Vetter Pharma-Fertigung GmbH & Co. KG.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................... 1

ISSUES PRESENTED ........................................................ 5

STATEMENT OF THE CASE ............................................. 6

    I.    Factual Background ................................................... 6

        A.    Anti-VEGF Drugs—Whether Packaged In Vials Or Prefilled Syringes—Treat Eye Diseases Caused By Protein Overproduction .............................. 6

        B.    Numerous Anti-VEGF Products Compete In The United States, Where Novartis Sells Only Vials........... 7

        C.    Vetter Is One Of Multiple "Fillers" Of Anti-VEGF Prefilled Syringes ......................................... 10

        D.    Novartis And Regeneron Develop Anti-VEGF Prefilled Syringes, And Novartis And Vetter Settle................................................................. 10

        E.    Regeneron Refuses To Work With Vetter ................... 11

        F.    Novartis Secures The '631 Patent For An Anti-VEGF Prefilled Syringe ............................... 12

        G.    Vetter Renews Its Offer To Fill Regeneron's PFS But Regeneron Refuses And Obtains An Alternate Filler ............................................. 13

    II.    Procedural History ................................................ 13

        A.    Novartis Sues Regeneron For Patent Infringement ...................................................... 13

        B.    Regeneron Retaliates By Suing Novartis And Vetter In The Wrong Court ......................... 14

        C.    The District Court Dismisses Regeneron's Complaint With Prejudice ........................... 16

SUMMARY OF ARGUMENT .......................................... 18

STANDARD OF REVIEW................................................. 21

ARGUMENT ................................................................... 22

I. The Court Should Affirm Dismissal Of All Of Regeneron's Antitrust Claims For Failure To Plead Facts Plausibly Showing That Novartis Has Monopoly Power In A Properly Defined Relevant Market ..................22

    A. Regeneron Fails To Plead Facts That Make An Anti-VEGF PFS-Only Market Plausible .....................24

        1. The Relevant Market Includes All Reasonably Interchangeable Substitute Products .................................................24

        2. Regeneron's Factual Allegations Show That Anti-VEGF Vials And PFSs Are Reasonably Interchangeable ...................................27

        3. Regeneron Fails To Show Legal Error ...............33

    B. Regeneron Fails To Plead Facts Plausibly Demonstrating That Novartis Has Monopoly Power In The Purported PFS-Only Market.................52

        1. Regeneron Fails To Plead That Novartis Competes In The U.S. PFS-Only Market ...........53

        2. Regeneron Fails To Plead That Lucentis PFS Has Any Share Of The Alleged PFS Market ..................................................................57

II. The Court Should Affirm The District Court's Dismissal Of All Claims Because They Are Untimely .........58

    A. Regeneron Fails To Plead With Particularity That Extraordinary Circumstances Prevented It From Filing Earlier ......................................................60

        1. Regeneron Waived Its Equitable Tolling Argument By Failing To Raise It Below.............60

        2. Regeneron Fails To Plead Fraudulent Concealment With Particularity.........................61

    B. Regeneron Fails To Plead Facts Plausibly Alleging A Continuing Violation .................................69

III.   The Court Should Affirm The Dismissal Of Regeneron's
       Anticompetitive Scheme And Conspiracy Claims
       Because Regeneron Fails To Plead Facts Plausibly
       Alleging That Appellees Foreclosed Access To PFS-
       Filling Services ....................................................................71

CONCLUSION ...........................................................................74

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC,*
241 F.Supp.3d 461 (S.D.N.Y. 2017)....................................................71

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) ...........................................23, 45, 73, 74

*AG Fur Industrielle Elektronik AGIE v. Sodick Co.,*
748 F. Supp. 1305 (N.D. Ill. 1990)......................................................57

*Am. Sales Co., Inc. v. AstraZeneca AB,*
2011 WL 1465786 (S.D.N.Y. 2011)..................................29, 31, 32, 34

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................3, 21

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,*
909 F.Supp. 162 (S.D.N.Y. 1995).......................................................27

*Bascolitsas v. 86th & 3rd Owner, LLC,*
702 F.3d 673 (2d Cir. 2012) ..............................................................59

*Bayer Schering Pharma AG v. Sandoz, Inc.,*
813 F.Supp.2d 569 (S.D.N.Y. 2011)..................................26, 29, 31, 34

*Bayer Schering Pharma AG v. Watson Pharms. Inc.,*
2010 WL 11578470 (D. Nev. 2010).....................................................34

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................21, 32

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) ................................................................. passim

*Chapman v. N.Y. State Div. for Youth,*
546 F.3d 230 (2d Cir. 2008) ..................................................... passim

*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.,*
708 F.App'x 29 (2d Cir. 2017) ...........................................................34

*City of N.Y. v. Grp. Health Inc.,*
  649 F.3d 151 (2d Cir. 2011) ....................................... 1, 23, 24

*Com. Data Servs., Inc. v. IBM Corp.,*
  262 F.Supp.2d 50 (S.D.N.Y. 2003)........................................ 72

*Concord Assocs., L.P. v. Ent. Props. Tr.,*
  817 F.3d 46 (2d Cir. 2016) ..................................... 24, 33, 34

*DiFolco v. MSNBC Cable LLC,*
  622 F.3d 104 (2d Cir. 2010) ........................................ 21, 29

*Discon, Inc. v. NYNEX Corp.,*
  93 F.3d 1055 (2d Cir. 1996) ............................................ 53

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.,*
  436 F.Supp.3d 754 (S.D.N.Y. 2020)....................................... 29

*E&L Consulting, Ltd. v. Doman Indus. Ltd.,*
  360 F.Supp.2d 465 (E.D.N.Y. 2005) ..................................... 36

*FLM Collision Parts, Inc. v. Ford Motor Co.,*
  543 F.2d 1019 (2d Cir. 1976) ....................................... 55, 56

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of
  Art & Design,*
  73 F.Supp.2d 829 (W.D. Mich. 1999) ..................................... 47

*Franco v. Roman Cath. Diocese of Las Vegas,*
  2009 WL 1777146 (N.Y. Sup. Ct. 2009) ................................... 65

*FTC v. Shkreli,*
  2022 WL 135026 (S.D.N.Y. 2022)......................................... 43

*Gen. Bus. Sys. v. N. Am. Philips Corp.,*
  699 F.2d 965 (9th Cir. 1983)............................................ 72

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.,*
  386 F.3d 485 (2d Cir. 2004) ............................... 37, 42, 50, 51

*H.J., Inc. v. Int'l Tel. & Tel. Corp.*,
  867 F.2d 1531 (8th Cir. 1989).............................................27

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989) ...........................................53

*Hack v. President & Fellows of Yale Coll.*,
  237 F.3d 81 (2d Cir. 2000) (2d Cir. 2021)..........................28

*Hebron v. Shelby Cty. Gov't*,
  406 F.App'x 28 (6th Cir. 2010) .........................................70

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006) .............................................46

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018)...........................................41

*Humana Inc. v. Mallinckrodt ARD LLC*,
  2020 WL 3041309 (C.D. Cal. 2020) ..................................34

*Ill. Tools Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006) ...........................................................35

*In re Ciprofloxacin Hydrocholoride Antitrust Litig.*,
  261 F.Supp.2d 188 (E.D.N.Y. 2003) ................................70

*In re Keurig Green Mountain Single-Serve Coffee Antitrust
  Litig.*,
  383 F.Supp.3d 187 (S.D.N.Y. 2019)..................................50

*In re Suboxone Antitrust Litig.*,
  2017 WL 4642285 (E.D. Pa. 2017) ...................................55

*In re Wellbutrin XL Antitrust Litig.*,
  2009 WL 678631 (E.D. Pa. 2009) .....................................56

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016)...............................................5

*Jackson v. Fed. Express,*
766 F.3d 189 (2d Cir. 2014) .............................................. 60

*Janese v. Fay,*
692 F.3d 221 (2d Cir. 2012) .............................................. 59

*Jordan v. Ford Motor Co.,*
73 A.D.2d 422 (N.Y. Sup. Ct. App. Div. 1980) .................... 65

*Kaufman v. Time Warner,*
836 F.3d 137 (2d Cir. 2016) .................................... 24, 52, 57

*Keating v. Carey,*
706 F.2d 377 (2d Cir. 1983) .............................................. 62

*Klehr v. A.O. Smith Corp.,*
521 U.S. 179 (1997) ........................................................ 59

*Kronos, Inc. v. AVX Corp.,*
81 N.Y.2d 90 (1993) ........................................................ 59

*Lannett Co. v. KV Pharm.,*
2009 WL 10737496 (D. Del. 2009) .................................... 34

*Lin v. USCIS,*
2008 WL 5063296 (2d Cir. 2008) ...................................... 61

*LLM Bar Exam, LLC v. Barbri, Inc.,*
271 F.Supp.3d 547 (S.D.N.Y. 2017) .............................. 36, 58

*LLM Bar Exam, LLC v. Barbri, Inc.,*
922 F.3d 136 (2d Cir. 2019) .................................... 36, 39, 58

*Lotes Co. v. Hon Hai Precision Indus. Co.,*
753 F.3d 395 (2d Cir. 2014) .............................................. 22

*Lowen v. Tower Asset Mgmt., Inc.,*
829 F.2d 1209 (2d Cir. 1987) ...................................... 60, 61

*Madison 92nd St. Assoc., LLC v. Courtyard Mgmt. Corp.*,
  624 F.App'x 23 (2d Cir. 2015) .............................................................. 34

*Maxon Hyundai Mazda v. Carfax, Inc.*,
  2014 WL 4988268 (S.D.N.Y. 2014) ................................................. 49, 50

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................. 22

*Menaker v. Hofstra Univ.*,
  935 F.3d 20 (2d Cir. 2019) .................................................................... 8

*Mercy-Peninsula Ambulance, Inc. v. San Mateo Cty.*,
  791 F.2d 755 (9th Cir. 1986) ............................................................... 55

*Minebea Co. v. Papst*,
  444 F.Supp.2d 68 (D.D.C. 2006) ......................................................... 54

*Name.space, Inc. v. ICANN*,
  795 F.3d 1124 (9th Cir. 2015) ............................................................. 55

*Olson v. Major League Baseball*,
  29 F.4th 59 (2d Cir. 2022) ....................................................... 21, 22, 63

*Ohio v. Am. Express Co.*,
  138 S.Ct. 2274 (2018) ............................................................. 23, 24, 46

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ......................................................... 25, 46

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ................................................................. 21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ......................................................... 38, 45

*Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*,
  138 F.Supp.3d 303 (S.D.N.Y. 2014) ................................................... 58

Page(s)

*Rai v. WB Imico Lexington Fee, LLC,*
  802 F.3d 353 (2d Cir. 2015) ................................................. 59

*Reifert v. S. Cent. Wis. MLS Corp.,*
  450 F.3d 312 (7th Cir. 2006) ............................................... 37

*Ross v. Louise Wise Servs., Inc.,*
  868 N.E.2d 189 (N.Y. 2007) ........................................... 62, 64

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.,*
  661 F.Supp.2d 218 (E.D.N.Y. 2009) ................................... 57

*Skyline Travel, Inc. v. Emirates,*
  476 F.App'x 480 (2d Cir. 2012) .......................................... 34

*Smith v. McGinnis,*
  208 F.3d 13 (2d Cir. 2000) ................................................. 62

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.,*
  414 F.App'x 372 (2d Cir. 2011) ..................................... 34, 36

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,*
  376 F.3d 1065 (11th Cir. 2005) .................................... 54, 55

*Spectrum Sports, Inc. v. McQuillan,*
  506 U.S. 447 (1993) ..................................................... 22, 52

*Swersky v. Dreyer & Traub,*
  219 A.D.2d 321 (N.Y. 1st Dep't 1996) ................................ 65

*Tampa Elec. Co. v. Nashville Coal Co.,*
  365 U.S. 320 (1961) .......................................................... 71

*Thompson v. 1-800 Contacts, Inc.,*
  2018 WL 2271024 (D. Utah 2018) ................................. 49, 50

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
  875 F.2d 1369 (9th Cir. 1989) ................................. 40, 41, 48

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ..............................................................25

*Top Mkts., Inc. v. Quality Mkts., Inc.,*
    142 F.3d 90 (2d Cir. 1998) .........................................................45, 46

*Twersky v. Yeshiva University,*
    993 F.Supp.2d 429 (S.D.N.Y. 2014)................................................64

*Twin Labs., Inc. v. Weider Health & Fitness,*
    900 F.2d 566 (2d Cir. 1990) ..................................................23, 52, 72

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,*
    7 F.3d 986 (11th Cir. 1993)...............................................................23

*United Commodities-Greece v. Fid. Int'l Bank,*
    478 N.E.2d 172 (N.Y. 1985) .............................................................65

*United States v. Am. Express Co.,*
    838 F.3d 179 (2d Cir. 2016) ..............................................................23

*United States v. Caronia,*
    703 F.3d 149 (2d Cir. 2012) ................................................................7

*United States v. Cont'l Can Co.,*
    378 U.S. 441 (1964).........................................................42, 43, 48, 49

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956)...........................................................................25

*United States v. Eastman Kodak Co.,*
    63 F.3d 95 (2d Cir. 1995) ..................................................................24

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ............................................................72

*United States v. Williams,*
    930 F.3d 44 (2d Cir. 2019) ................................................................61

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019) ............................................ 69, 70

*Williams v. Affinion Grp., LLC*,
889 F.3d 116 (2d Cir. 2018) ............................................... 63

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ............................................... 72

*Zirvi v. Flatley*,
433 F.Supp.3d 448 (S.D.N.Y. 2020)...................................... 68

*Zumpano v. Quinn*,
849 N.E.2d 926 (N.Y. 2006) ................................... 62, 64, 65

**Other Authorities**

Eric Souied et al., *Ranibizumab Prefilled Syringes: Benefits of Reduced Syringe Preparation Times and Less Complex Preparation Procedures*, Nat'l Library Med. (May 18, 2015), https://pubmed.ncbi.nlm.nih.gov/ 26044375............................. 8

Michael Colucciello, *Prefilled Syringe Delivery of Intravitreal Anti-VEGF Medications: Advantages for Patients and Physicians*, Retinal Physician (Mar. 1, 2019), https://www.retinalphysician.com/issues/2019/march-2019/prefilled-syringe-delivery-of-intravitreal-anti-ve ....................... 8

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY (2017)........................................... 35, 36

**Rules**

Fed.R.Civ.P. 9(b)....................................................................... 62

**Treatises**

PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
¶562(a) (2020)...................................................................... 42

**INTRODUCTION**

Novartis has a U.S. patent covering an innovative system for delivering "anti-VEGFs," drugs that treat eye diseases. The patented invention is a particular type of prefilled syringe, or "PFS." When an anti-VEGF is sold in a vial, doctors must extract the medicine into a syringe before injecting it into patients' eyes. But with a PFS, doctors only have to attach a needle to the syringe before injection.

When Regeneron began selling an anti-VEGF PFS in the United States, Novartis sued Regeneron for patent infringement. Regeneron retaliated by filing an antitrust case against Novartis and Vetter (a company that fills syringes and licenses Novartis's patent). To support its antitrust claims, Regeneron had to allege a plausible "relevant market," and plead facts showing that Novartis possesses, or is dangerously close to achieving, monopoly power in that market. The relevant market must include "all products" that are "reasonably interchangeable by consumers for the same purposes"[1]—here, to treat eye diseases.

This pleading requirement posed a problem: Novartis is not a monopolist in the anti-VEGF market. There are plenty of anti-VEGFs

_____

[1] *City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).

available in vials and PFSs, and Novartis's anti-VEGF drug, which is sold in vials, has a small market share. So Regeneron concocted a market limited to "anti-VEGF prefilled syringes." Regeneron insists that anti-VEGF vials and PFSs are not reasonably interchangeable—and thus occupy separate markets—despite admitting that they deliver the same medicines, treat the same diseases, and are administered the same way. In a further leap, Regeneron claims Novartis has monopoly power in this "PFS-only" market because another company—Novartis's licensee, Genentech—sells an anti-VEGF PFS in the United States.

In fact, Regeneron's First Amended Complaint ("Complaint") teems with allegations recognizing that vials and PFSs compete in the same market. On page one, Regeneron alleges that Novartis's anti-VEGF vials "compete[] against" Regeneron's PFSs. JA334 (¶2). Regeneron acknowledges that vials and PFSs deliver "the same active drug ingredient," JA417 (¶196), treat the same diseases, JA348 (¶¶33-35), and are both administered by injection, JA360-61 (¶¶76-77). Far from pleading a lack of substitutability between vials and PFSs, Regeneron alleges that physicians have widely "converted" patients from vials to

PFSs.  JA365 (¶88).  Sure, PFSs' benefits give them a "competitive advantage," JA364 (¶85), but that just underscores that they belong in the same market as vials: "competitive advantages" are relevant only in the context of *competition*.

Regeneron's Complaint is just as notable for what it does *not* allege.  Regeneron fails to plead facts indicating that PFSs' alleged benefits lead patients or doctors—the consumers here—to view vials and PFSs as inadequate substitutes.  Regeneron does not allege price differentials between vials and PFSs, nor does it plead facts establishing that doctors and patients are unable or unwilling to switch between vials and PFSs in response to price changes.  And despite asserting that Genentech's anti-VEGF PFS product is dangerously close to a monopoly, Regeneron is silent on that product's market share.

These foundational failures led the district court to dismiss Regeneron's Complaint.  Holding Regeneron to its burden of pleading "sufficient factual matter" to state a "plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), the court rejected Regeneron's argument that any alleged differences between PFSs and vials "plausibly justif[ied]" Regeneron's manufactured PFS-only market, SPA-25.

The district court also rejected Regeneron's tortious-interference claim as untimely. On that score, the court held that Regeneron waived the timeliness issue because it "spent not a single word" arguing the point, and alternatively that Regeneron failed to plead with particularity that extraordinary circumstances prevented timely filing. SPA-31.

This Court should affirm dismissal for those same reasons. Alternatively, the Court can affirm on the following independent bases:

*First*, this Court should affirm dismissal of the antitrust claims because Regeneron fails to allege that Novartis has any power (let alone monopoly power) in the purported PFS market. A firm cannot monopolize a market in which it does not compete, and Novartis does not sell an anti-VEGF PFS in the U.S. Regeneron tries to circumvent that by imputing Genentech's anti-VEGF PFS sales to Novartis, but neither a patent license nor a minority interest in Genentech's parent company provides a basis for treating Genentech as Novartis's alter ego. In any event, Regeneron neglects to plead Genentech's PFS market share—precluding any assertion of monopoly status.

*Second*, all Regeneron's claims are untimely. The limitations periods applicable to Regeneron's antitrust and tort claims began in 2013,

when Regeneron claims it first suffered injury.  Regeneron did not file its claims until 2020—more than three years too late.  Regeneron does not plead any sufficient basis for tolling the limitations periods.

*Third*, the Court should affirm the dismissal of the "anticompetitive scheme" and "conspiracy" antitrust claims (Counts II and III) because Regeneron does not plead facts showing that Appellees foreclosed access to PFS-filling services.  Far from pleading that it lacked access to filling services, Regeneron says it rebuffed Vetter because it wanted to work with other fillers—and that is what it did.

This case serves as a reminder that a plaintiff cannot "gerrymander its way to an antitrust victory without due regard for market realities."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).  Rather than defend its patent infringement on the merits, Regeneron resorted to facially implausible antitrust claims.  The district court correctly dismissed Regeneron's Complaint.  Appellees respectfully request that this Court affirm.

## ISSUES PRESENTED

I.     Whether the district court properly concluded that Regeneron failed to plead any plausible antitrust claim.

II.    Whether the district court properly concluded that Regeneron failed to plead a timely tortious-interference claim.

## STATEMENT OF THE CASE

## I.    Factual Background

### A.    Anti-VEGF Drugs—Whether Packaged In Vials Or Prefilled Syringes—Treat Eye Diseases Caused By Protein Overproduction

Millions of Americans suffer from the overproduction of a protein called vascular endothelial growth factor ("VEGF").  JA336 (¶5).  If left untreated, that overproduction can cause people to "see the world as if through distorted lenses: straight lines may appear bent, central vision may be reduced, colors may be dulled, and patients may see haziness."  JA349 (¶38).  Some suffer permanent blindness.  JA349 (¶39).

By inhibiting protein overproduction, anti-VEGFs "help[] to stabilize vision loss, and in some cases, can even reverse vision loss and restore sight."  JA348 (¶¶33-34).  That is why anti-VEGFs "are publicly recognized in the medical community as the standard of care for treating certain ophthalmic diseases."  JA416 (¶192).

Doctors administer anti-VEGFs via injection into patients' eyes.  JA348 (¶35).  Anti-VEGFs come in vials and in prefilled syringes.  JA336 (¶6).  With vials, doctors draw the medicine into a syringe; with

6

PFSs, the manufacturer fills the syringes.  JA360-61 (¶¶76-77).  In either case, doctors must "attach[] a needle" to the syringe before injection.  JA360-61 (¶¶76-77).  Vials and PFSs deliver the "same active drug ingredient" and treat the same diseases.  JA348, 417-18 (¶¶33, 196).

## B.  Numerous Anti-VEGF Products Compete In The United States, Where Novartis Sells Only Vials

The U.S. "market for anti-VEGFs," JA336 (¶6), includes several competitors.  Regeneron markets Eylea, Novartis markets Beovu, and Genentech markets Lucentis (but allegedly co-developed the product with Novartis).[2]  JA334-35, 351, 360 (¶¶1-2 & n.1, 48-49, 75).[3]  Genentech's cancer drug Avastin, another anti-VEGF, is used "off-label" to treat eye diseases.  JA358 (¶70).[4]

---

[2] This brief uses lowercase to refer to drug names, including when quoting the Complaint.  In those instances, brackets do not appear.

[3] An anti-VEGF PFS called Macugen is "still available" but "rarely prescribed."  JA360, 364 (¶¶75, 86 n.53).

[4] "Off-label" use is lawful and "may even constitute a medically[-]recognized standard of care."  *United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012) (brackets in original).

All except Novartis's Beovu are available in PFSs.[5]  JA355 (¶64). While Regeneron long sold Eylea in vials, it now predominantly sells it in PFSs.  JA336, 355 (¶¶6, 62).  The same is true of Lucentis.  JA336, 351 (¶¶6, 49).[6]  And though Avastin is "sold in large vials," pharmacies can "repackage[]" Avastin to treat eye diseases.  JA358-59 (¶71).  When repackaged, Avastin comes in PFSs.  JA361-62, 419 (¶¶78-81, 198).[7]

PFSs offer certain benefits.  For example, PFSs modestly shorten administration time[8] and reduce "touch points," which mitigates the

---

[5] It is immaterial that Beovu PFS became available in June 2022.  Br. 9 n.3.  That falls outside the period in which Regeneron alleges Appellees acted anticompetitively, JA428, 432 (¶¶226, 237), and Regeneron does not allege that Beovu has anything nearing monopoly power.

[6] Regeneron alleges that Novartis owned a minority share in Genentech's parent during the relevant period.  JA352 (¶53).  Regeneron does not allege that Novartis had any stake in Genentech.

[7] *See* Michael Colucciello, *Prefilled Syringe Delivery of Intravitreal Anti-VEGF Medications: Advantages for Patients and Physicians*, Retinal Physician (Mar. 1, 2019), https://www.retinalphysician.com/is-sues/2019/march-2019/prefilled-syringe-delivery-of-intravitreal-anti-ve ("The anti-VEGF agents bevacizumab [Avastin] and ranibizumab [Lucentis] are currently available in prefilled syringes."), *quoted and cited in* JA361-62, 419 (¶¶78-81, 198).  The Court can consider materials quoted in Regeneron's Complaint.  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 27-28 & n.7 (2d Cir. 2019).

[8] Regeneron says PFSs reduce preparation time by 40%.  Br. 10; JA362 (¶80).  As the source for that figure clarifies, the difference is about 25 seconds.  JA362 (¶80) (citing Colucciello, *supra* note 7, which in turn

risk of "foreign particles being introduced into the eye." JA361-62 (¶¶78-79). PFSs also "enable[] the required dose to be delivered more precisely." JA361-62 (¶79). These benefits give PFSs a "competitive advantage" over vials. JA363-64 (¶85); Br. 2.

Regeneron acknowledges competition between anti-VEGF vials and PFSs. Right from the jump, it alleges that Beovu, which is sold in vials, "competes against Eylea," which is sold predominantly in PFSs. JA334-35 (¶2). Notwithstanding their differences, Regeneron describes anti-VEGF vials and PFSs as "competing drugs." JA336 (¶5). And Regeneron notes that when Lucentis PFS launched, "it competed against Eylea in vial form." Br. 32; *see* JA365 (¶88). Regeneron admits that if Eylea PFS were unavailable, doctors and patients would "choose" between Lucentis PFS, Beovu vials, and Eylea vials. JA414-15 (¶189).

Despite recognizing the availability of so many alternatives, Regeneron does not identify any producer's market share.

---

cites Eric Souied et al., *Ranibizumab Prefilled Syringes: Benefits of Reduced Syringe Preparation Times and Less Complex Preparation Procedures*, Nat'l Library Med. (May 18, 2015), https://pubmed.ncbi.nlm-nih.gov/26044375 (PFSs reduce preparation time by 17-29 seconds)).

## C. Vetter Is One Of Multiple "Fillers" Of Anti-VEGF Prefilled Syringes

Regardless of whether an anti-VEGF is packaged in vials or PFSs, a "filler" like Vetter must add the medicine to the vial or syringe before packaging. JA334-35 (¶2). As Regeneron acknowledges, there are multiple fillers. *E.g.*, JA339-40 (¶11) (there are "different PFS filler[s]"); JA408 (¶175) (Regeneron found alternative "PFS filler").

Regeneron does not identify the number of fillers or Vetter's share of the filling market.

## D. Novartis And Regeneron Develop Anti-VEGF Prefilled Syringes, And Novartis And Vetter Settle

Novartis and Regeneron each collaborated with Vetter while developing an anti-VEGF PFS. JA389-96 (¶¶140-52). Their respective efforts were formalized in agreements: for Novartis, the "Lucentis PFS Development Agreement," JA389 (¶140); and for Regeneron, the "Eylea PFS Development Agreement," JA394-95 (¶148).

Regeneron started working with Vetter in 2005. JA396-97 (¶152). According to Regeneron, the companies amended their agreement in 2009 to grant Regeneron "ownership rights to any inventions related to an Eylea PFS that were conceived or reduced to practice by Regeneron and/or Vetter." JA396-97 (¶152).

Also around 2009, Novartis contracted with Vetter for work on Lucentis PFS.  JA399 (¶155).  After a few years, Novartis filed patent applications for an anti-VEGF PFS, including in the United States.  JA399, 369-70 (¶¶155, 99).  In 2013, Vetter objected to Novartis's German and Australian patent applications, asserting that they potentially violated the Lucentis PFS Development Agreement.  JA390 (¶142).

Novartis and Vetter resolved their concerns in October 2013 by way of the "Fourth Lucentis Development Agreement Amendment."  JA391-92 (¶146).  That amendment granted Vetter a "co-exclusive license" to Novartis's patent portfolio, JA400 (¶157), and authorized Vetter to issue sublicenses—including royalty-free sublicenses to existing clients like Regeneron, CA234-35 (§2.3(b)).  Novartis acknowledged that Vetter "significantly contributed to the development of the Novartis Ophthalmology PFS IP" but did not credit Vetter with any "invention."  JA391-93 (¶146).

## E.    Regeneron Refuses To Work With Vetter

A month later, Vetter informed Regeneron of its dispute with Novartis, the resolution of that dispute, and Novartis's patent applications.  JA404 (¶166).  As authorized by the October 2013 Fourth

Amendment, Vetter offered Regeneron a royalty-free sublicense to Novartis's patents, on the condition that if Regeneron challenged the patents' validity or enforceability, the license would be terminated. JA404-06 (¶¶167-70).[9]

Regeneron chose to shop for another filler. JA408 (¶174).

## F. Novartis Secures The '631 Patent For An Anti-VEGF Prefilled Syringe

In December 2015, the U.S. Patent & Trademark Office issued the '631 Patent to Novartis. JA337-39 (¶9). That patent claims various permutations of a PFS containing an anti-VEGF. JA337-39 (¶¶8-9). Regeneron does not allege that the patent covers every way of delivering an anti-VEGF in a PFS. *See* Br. 44-45 n.17.

Novartis licensed the '631 Patent to Genentech. JA363 (¶84). Genentech began selling Lucentis PFS in the U.S. in 2018, while Novartis sold the product overseas. JA352-53, 363 (¶¶53-54, 84). Genentech's

---

[9] Regeneron claims Vetter's offer demanded that Regeneron "commit to use Vetter as its *exclusive PFS filler*," Br. 14 (emphasis in original), but the offer does not include an exclusivity term, JA242-45.

parent company touted PFSs' "competitive advantage": following Lucentis PFS's launch in the United States, "more than 80%" of Lucentis patients switched from vials to PFSs.  JA363-64 (¶85).

### G. Vetter Renews Its Offer To Fill Regeneron's PFS But Regeneron Refuses And Obtains An Alternate Filler

In 2017, Regeneron had "renewed discussions with Vetter," during which Vetter "reaffirm[ed] its earlier demand" and offered Regeneron the exact same royalty-free sublicense to the '631 Patent.  JA344, 408-09 (¶¶18, 175-76).  Regeneron again rejected Vetter.  JA408-09 (¶176).  Regeneron found another filler and launched Eylea PFS in late 2019.  JA364, 408, 387 (¶¶87, 175, 137).

## II. Procedural History

### A. Novartis Sues Regeneron For Patent Infringement

In December 2019, Novartis and Vetter amended their development agreement again.  CA246.  This amendment required Vetter to



CA253

(§2.2(d)(iv)).

CA251 (§2.2(d)(ii)); CA68 (¶158).

In June 2020, Novartis filed complaints against Regeneron in the Northern District of New York and the International Trade Commission, alleging that Eylea PFS infringes the '631 Patent. JA342-43, 345-47, 414 (¶¶15, 20-28, 188). Regeneron successfully moved to stay the federal-court case. No. 20-cv-00690 (N.D.N.Y. July 28, 2020), Dkt. 24. After Novartis withdrew the ITC complaint, the stay was lifted.

## B. Regeneron Retaliates By Suing Novartis And Vetter In The Wrong Court

A month after Novartis sued Regeneron, Regeneron sued Appellees in the Southern District of New York for alleged antitrust violations. Dkt. 1. The court (Nathan, J.) transferred Regeneron's action to the Northern District. Dkt. 139.

This appeal arises from the Northern District's dismissal of Regeneron's First Amended Complaint, which was filed before the transfer and after Appellees' motions to dismiss the original complaint were fully briefed. Regeneron claimed it could not have amended earlier because it learned "for the first time" of "Novartis's [alleged] inventorship deception" in December 2020 through Vetter's document production, JA338-39 (¶9)—despite having challenged the '631 Patent's inventorship at the ITC months earlier, before receiving that discovery, Resp. to

Compl. 19-20, *Certain Pre-Filled Syringe for Intravitreal Injection and Components Thereo*f, USITC Inv. No. 337-TA-1207 (Aug. 25, 2020).

The crux of Regeneron's case is that the '631 Patent is unenforceable because it was fraudulently procured as part of a "scheme" and "conspiracy" to prevent Eylea PFS from competing in the U.S. For each antitrust claim, Regeneron contends the relevant product market is "anti-VEGFs *in prefilled syringes* that are approved by the FDA for the treatment of certain ophthalmic diseases," JA415-16 (¶191) (emphasis added), and the relevant geographic market is the U.S., JA420 (¶201).

Regeneron asserts the following claims:

*First*, Regeneron alleges that Novartis committed "*Walker Process* fraud" by omitting material prior art and Vetter employees' alleged contributions from the '631 Patent application. JA426-27, 448-51 (¶¶218-20, 278-83 (alleging attempted monopolization under Sherman Act, Section 2) (Counts I and IV)).

*Second*, Regeneron alleges that Novartis "embarked on an anti-competitive scheme" by fraudulently obtaining the '631 Patent, foreclosing access to PFS-filling services, and filing infringement actions

against Regeneron.  JA431-35  (¶¶233-43) (alleging attempted monopo-

lization under Sherman Act, Section 2) (Count II).

*Third*, Regeneron alleges that Appellees entered a "conspiracy to

hinder, delay, and unreasonably restrain competition in the PFS anti-

VEGF market."  JA439-40 (¶256) (alleging unreasonable restraint un-

der Sherman Act, Section 1) (Count III).  Pursuant to this "conspiracy,"

Regeneron claims, Appellees sought to "force" Regeneron to accept un-

desirable license terms—to be clear, a *royalty-free* license—or "secure a

completely new supply and fill chain" for Eylea PFS.  JA442 (¶¶261-62).

*Finally*, Regeneron alleges that Novartis tortiously interfered with

the Eylea PFS Development Agreement.  JA451-52 (¶286) (Count V).

## C.  The District Court Dismisses Regeneron's Complaint With Prejudice

The district court dismissed Regeneron's claims in full.

***Antitrust claims.***  The court dismissed Regeneron's antitrust

claims on the ground that Regeneron's proposed PFS-only market is im-

plausible.  The court held that PFSs' alleged "performance-based ad-

vantages" do not plausibly establish that vials are not reasonable sub-

stitutes.  SPA-24.  It also explained that any "difference in the equip-

ment required to produce a PFS as opposed to a vial says nothing about

16

whether a *consumer* would find a vial and PFS interchangeable." SPA-25 (emphasis added).[10] And Regeneron's unadorned statement that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS" was simply a legal conclusion. SPA-24-25.

The district court also observed that accepting Regeneron's proposed market would mean that merely holding a patent would confer monopoly power on Novartis. SPA-26. The court recognized that there may be "a circumstance where the subject of a patent is so novel that there really is no fitting substitute," but found that Regeneron had not shown that "this case fits that bill." SPA-27.

***Tortious-interference claim.*** The court dismissed Regeneron's tortious-interference claim for two reasons. SPA-34-35. First, it found that Regeneron's failure to spend "a single word defending its tortious interference claim" warranted dismissal. SPA-31. Second, the court held "in the alternative" that "the statute of limitations would have run

---

[10] That is contrary to *amici* federal agencies' assertion that the court considered only whether vials and PFSs are "functional substitutes" and not whether they are "reasonably interchangeable from the standpoint of the relevant consumers." Dkt. 90 ("DOJ/FTC Br.") 2.

out on Regeneron's tortious interference claims no later than December of 2018," meaning Regeneron's 2020 lawsuit was "plainly untimely." SPA-31-32. The court refused to apply equitable estoppel, finding that the Complaint showed that Regeneron "had notice sufficient to call for further investigation" of its claim "as early as 2013." SPA-33.

Regeneron appeals.

## SUMMARY OF ARGUMENT

The Court should affirm dismissal for three independent reasons.

1. ***No monopoly power in a plausible relevant market.*** Regeneron's antitrust claims fail because Regeneron does not plead facts plausibly establishing that Novartis has monopoly power (or a dangerous probability of achieving that power) in a plausible relevant market.

a. The district court correctly held that Regeneron fails to allege a plausible "anti-VEGF PFS" market. Because Regeneron concedes that anti-VEGF PFSs and vials treat the same diseases, carry the same drugs, are administered the same way, and exhibit real-world substitution, while failing to plead facts demonstrating that doctors and patients see vials and PFSs as inadequate substitutes, its proposed PFS-only market is implausible.

b. The Court should also affirm dismissal of the antitrust claims because Regeneron fails to allege that Novartis possesses *any* power—let alone monopoly power—in a PFS-only market.

First, Novartis does not sell an anti-VEGF PFS in the U.S.  As Regeneron pleads, only Genentech sells Lucentis PFS here.  A firm cannot monopolize a market in which it does not compete.

Second, even if Genentech's sales could be imputed to Novartis, Regeneron's claims still fail because Regeneron does not plead Lucentis PFS's share of the "anti-VEGF PFS" market.  Regeneron's conclusory assertion that Lucentis PFS has a "significant" share, JA428 (¶226), falls well short of what Regeneron must plead to show that Novartis has monopoly power or a dangerous probability of achieving it.

2. ***Regeneron's claims are time-barred.***  Because the district court dismissed Regeneron's antitrust claims on relevant-market grounds, it considered only whether the tortious-interference claim was timely—and concluded it was not.  Because Regeneron filed all of its claims too late, they are all time-barred.

a. The limitations periods began when Regeneron claims it first suffered injury. That was in 2013, when Vetter allegedly "cut off Regeneron" by offering a sublicense to the '631 Patent. JA404, 408 (¶166, 175). Regeneron did not sue until 2020—years too late.

b. There is no basis for tolling the antitrust or tort limitations periods. First, Regeneron fails to plead with particularity that extraordinary circumstances prevented it from suing earlier; Regeneron does not allege ignorance of the facts or diligence in uncovering relevant information. Second, because Regeneron does not plead any new and independent overt acts during the limitations periods, the continuing-violations doctrine does not excuse its delay.

3. ***No foreclosure of access to filling services.*** The Court should affirm the dismissal of the "anticompetitive scheme" and "conspiracy" claims for the additional reason that Regeneron does not plead facts showing that Appellees foreclosed access to PFS-filling services. Regeneron alleges neither that Appellees blocked it from obtaining filling services—Regeneron found another filler—nor that Vetter controls any significant share of the PFS-filling market—a prerequisite for any assertion that Vetter *could* foreclose access.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint. *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.[11] "[F]acts that are merely consistent with a defendant's liability" do not cut it; plausibility "asks for more." *Id.*; *see Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.").

This Court need not accept allegations that are contradicted by "the facts alleged in the complaint" or by "documents incorporated by reference." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Nor do "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[11] Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

This Court may "affirm on any ground supported by the record," *Olson*, 29 F.4th at 84, "including grounds not relied on by the district court," *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014); *e.g.*, *Olson*, 29 F.4th at 73, 84; *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

## ARGUMENT

### I. The Court Should Affirm Dismissal Of All Of Regeneron's Antitrust Claims For Failure To Plead Facts Plausibly Showing That Novartis Has Monopoly Power In A Properly Defined Relevant Market

This Court should affirm the dismissal of Regeneron's antitrust claims because Regeneron fails to plausibly allege (i) a properly defined relevant market, in which (ii) Novartis has monopoly power or a dangerous probability of achieving that power. Regeneron's antitrust claims require both, but Regeneron has pleaded neither.

***Attempted monopolization.*** A plaintiff bringing an attempted-monopolization claim must show that the defendant "engaged in predatory or anticompetitive conduct" with the "specific intent to monopolize," and that the defendant has "a dangerous probability of achieving monopoly power" in a cognizable relevant market. *Spectrum Sports, Inc. v.*

*McQuillan*, 506 U.S. 447, 456 (1993). To satisfy the "dangerous probability" element, the plaintiff must "allege a plausible relevant market in which competition will be impaired," *City of N.Y.*, 649 F.3d at 155, and make a "threshold showing" of "sufficient market share by the defendant," *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990). That requires a share of at least 40% to 50%. *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999) ("It would appear rather difficult to establish the dangerous probability element where a defendant holds less than a 40% share of a market."); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) ("[B]ecause [Defendant] possessed less than 50% of the market … there was no dangerous probability of success.").

***Unlawful restraint of trade.*** An antitrust plaintiff challenging a "vertical restraint"—an agreement between firms at different levels of the supply chain, like Novartis and Vetter—must establish that the agreement "unreasonably restrains trade." *United States v. Am. Express Co.*, 838 F.3d 179, 193-94 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.* ("*Amex*"), 138 S.Ct. 2274 (2018). Since vertical restraints "pose no risk to competition unless the entity imposing them

has market power," *Amex*, 138 S.Ct. at 2285 n.7, the plaintiff must plead facts showing that the defendant possesses power (not just a dangerous probability of power) within a plausible relevant market, *Kaufman v. Time Warner*, 836 F.3d 137, 147-48 (2d Cir. 2016); *City of N.Y.*, 649 F.3d at 155.

Regeneron does not plead a plausible "anti-VEGF PFS" market. Even if it did, it does not plead that Novartis has any power in that proposed market. These deficiencies compel affirmance.

## A. Regeneron Fails To Plead Facts That Make An Anti-VEGF PFS-Only Market Plausible

The district court dismissed Regeneron's antitrust claims because Regeneron "failed to meaningfully explain why anti-VEGF vials are not a reasonable substitute for an anti-VEGF PFS," which rendered its proposed "PFS-only" market implausible. SPA-27. This Court should affirm for the same reason.

### 1. The Relevant Market Includes All Reasonably Interchangeable Substitute Products

Market definition has two components: geographic market and product market. *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). The geographic market (here, the U.S.) is the geographic zone of competition. *See United States v. Eastman Kodak Co.*,

63 F.3d 95, 104 (2d Cir. 1995).  The product market includes all products that "have reasonable interchangeability for the purpose for which they are produced—price, use, and qualities considered."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

Consumer demand determines reasonable interchangeability. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956).  Specifically, products are "reasonably interchangeable where there is sufficient cross-elasticity of demand," such that "a slight increase in the price of one product" would cause consumers to "switch[] to another product."  *Todd v. Exxon Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001).  As the *amici* States admit, interchangeability requires only that products be "acceptable substitutes."  Dkt. 106 ("States' Br.") 8 (quoting *PepsiCo*, 315 F.3d at 105).

Courts sometimes look to "practical indicia" when delineating the "outer boundaries of a product market."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Those indicia can include "industry or public recognition of the []market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities,

distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* These indicia do not supplant standard market-definition principles; the touchstone remains "reasonable interchangeability of use or cross-elasticity of demand between the product and substitutes for it." *Id.* This ensures the market definition "correspond[s] to the commercial realities of the industry." *Id.* at 336-37.

Accordingly, courts dismiss antitrust claims when a plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008). That includes when plaintiffs "admit in their complaint that" purportedly non-interchangeable products "compete." *Id.* Under these principles, an alleged pharmaceutical market is implausible when plaintiffs fail to "plead sufficient facts" showing that consumers do not view "other available treatments" as "acceptable" substitutes for drugs within the alleged market. *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F.Supp.2d 569, 577 (S.D.N.Y. 2011).

### 2. Regeneron's Factual Allegations Show That Anti-VEGF Vials And PFSs Are Reasonably Interchangeable

Regeneron's allegations demonstrate that anti-VEGF vials and PFSs compete: they carry the same drugs, treat the same diseases, target the same consumers, are administered the same way, and exhibit real-world substitution. Given those allegations, the district court correctly rejected Regeneron's PFS-only market. SPA-27-28.

Reasonable interchangeability does not deal in absolutes. Products need only be "roughly equivalent" to compete in the same market. *Chapman*, 546 F.3d at 238. Products may compete even where one is "easier" to use, is "more efficient," or has a longer "operational life." *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1538-39 (8th Cir. 1989); *see B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 172 n.7 (S.D.N.Y. 1995) ("Simply because this new invention could allegedly do in one X-ray what previously could be done in two x-rays does not necessarily create a relevant market.").

Consider the market for higher education. Each college is unique. Some offer stellar academics, others prioritize sports, and a few more

tout small class sizes.  A student may feel that her college's unique at-tributes make it one-of-a-kind.  Yet when Yale students alleged that "a Yale degree has unique attributes that make it without substitute or equal, including the access it provides to Yale's alumni network and its incomparable value to potential employers and graduate schools," this Court disagreed.  *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86-87 (2d Cir. 2000) (affirming dismissal), *abrogated on other grounds by Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021).  Reject-ing the argument that those advantages made Yale a market unto it-self, the Court explained that while there may be "no substitute for a Yale education" in a "collegiate sense," plaintiffs did not allege facts suggesting that students "could [not] matriculate elsewhere." *Id.* Plaintiffs cannot limit a market without plausible factual allegations that quality or convenience differences render products *economically* non-interchangeable.

Applying that principle, courts have held that where a plaintiff pleads a market comprised of some (but not all) pharmaceutical prod-ucts that treat the same condition, the plaintiff must "allege why a con-

sumer would not view any other number of products as adequate substitutes for treatment of" that condition. *Am. Sales Co., Inc. v. Astra-Zeneca AB,* 2011 WL 1465786, at *3 (S.D.N.Y. 2011). Allegations that other drugs have different ingredients, *id.*, or that they have different "risk[s]" and "side effects," *Bayer*, 813 F.Supp.2d at 577, do not warrant exclusion from the relevant market. Rather, plaintiffs must "articulate[]" how a "drug has characteristics so unique that a consumer would not respond, or has not responded, to a slight price increase by purchasing a different product." *Am. Sales*, 2011 WL 1465786, at *4 (dismissing claims); *see Bayer*, 813 F.Supp.2d at 577 (same).

Regeneron articulates nothing of the sort. If anything, its allegations negate the plausibility of a PFS-only market. *See DiFolco*, 622 F.3d at 111 (allegations are implausible where contradicted by "facts alleged in the complaint"); *Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F.Supp.3d 754, 765-66 (S.D.N.Y. 2020) (dismissing antitrust claims based on party's admission of real-world substitution).

To begin, Regeneron alleges that anti-VEGF vials and PFSs treat the same diseases and are administered the same way. JA348 (¶¶33-

35).  Regeneron also admits that the products target the same consumers; Novartis, for example, has "tried to steer physicians and patients away from Eylea," which is predominantly sold in PFSs, to "its own Beovu," which is sold in vials.  JA412 (¶183).  And Regeneron pleads real-world evidence of consumer substitution between vials and PFSs: "[o]nce a PFS launches," doctors "convert[] their patients from the vial version to the PFS version."  JA365 (¶88); *see* JA355, 418 (¶¶62, 197).  That indicates that doctors and patients view vials and PFSs as interchangeable methods for delivering the same drug; otherwise, they would not shift between the two.  In a similar vein, Regeneron alleges that if Eylea PFS were not on the market, patients and doctors would "choose" between the remaining anti-VEGF vials and PFSs.  JA414-15 (¶189).  Consumers would not have that "choice," JA345-46 (¶21), unless vials and PFSs were reasonably interchangeable.

These allegations describe how anti-VEGF vials and PFSs interact in the real world: they are substitutes.  And these concessions sink Regeneron's PFS-only market, since they establish that anti-VEGF vials and PFSs compete, that patients and doctors can choose between them to treat the same diseases, and that consumer switching occurs.  *See*

*Chapman*, 546 F.3d at 238 (when a complaint "readily admits" competition between assertedly distinct products, a plaintiff's purported market boundaries fail); *Bayer*, 813 F.Supp.2d at 575 ("Every product that can be substituted for the same use or purpose should be included within a single product market."). The district court properly rejected Regeneron's PFS-only market. SPA-27-28.

Not only does Regeneron concede that PFSs and vials are reasonably interchangeable, it also fails to "allege why a consumer would not view" anti-VEGF vials and PFSs as "adequate substitutes for treatment." *Am. Sales,* 2011 WL 1465786, at *3. In *Bayer*, for example, the plaintiff attempted to exclude all but two drugs from its market by alleging that other treatments were riskier and posed "additional serious side effects." 813 F.Supp.2d at 577. The court rejected the proposed market, holding that while a plaintiff "need not address every conceivable, far-fetched alternative," the failure to "plead sufficient facts to demonstrate that no" other drug "is an acceptable substitute" made the proposed limitations implausible. *Id.* at 577-78.

So too, the court in *American Sales* rejected a proposed market as implausibly narrow because the plaintiff, who alleged that a drug had

unique "characteristics," failed to plead facts showing that consumers would not substitute other drugs to treat the same condition. 2011 WL 1465786, at *3-4. In other words, merely identifying differences between therapeutic alternatives does not plausibly establish that those products compete in separate markets. The plaintiff must plead facts showing that those differences are *economically* significant. *Id.*

Regeneron's allegations are even sparser than those rejected in *American Sales* and *Bayer*. In those cases, the plaintiffs at least alleged different therapeutic ingredients; all Regeneron alleges is that PFSs are marginally quicker and safer because they remove some steps and "touch points" from the in-office assembly process. *See supra* p. 8. Yet Regeneron does not plead facts showing that these benefits are *economically* significant to consumers, such that a small price increase for PFSs would not induce switching to vials. As the district court observed, Regeneron's unsupported statement that "a small, but significant, price increase in the PFS version would not cause physicians to substitute the vial version for PFS" is simply a legal conclusion. SPA-24-25; *see Twombly*, 550 U.S. at 555 ("labels and conclusions" fail "to state a claim for relief that is plausible on its face").

These deficiencies make Regeneron's PFS-only market implausible. *See Chapman*, 546 F.3d at 238 (affirming dismissal for failure to plead economically significant facts).

### 3. Regeneron Fails To Show Legal Error

Regeneron asserts that the district court erred in three respects: (i) market definition is "fact-intensive," Br. 3, 28; (ii) the district court "invented" a new rule "that markets generally cannot be coextensive with a patent," Br. 24; and (iii) the district court failed to properly apply *Brown Shoe*'s "practical indicia" of market boundaries, Br. 41. None of Regeneron's arguments hold water.

To start, Regeneron and *amici*'s argument that market definition is too factual for resolution on the pleadings, Br. 3, 28; States' Br. 3; Dkt. 95-2 ("Open Markets Br.") 21-23, conflicts with this Court's recognition that "it is appropriate for a district court to assess whether the plaintiff's complaint asserts sufficient facts to allege plausibly the existence" of a relevant market, and when the answer is no, to dismiss the complaint, *Concord Assocs.*, 817 F.3d at 53-55 (affirming dismissal where plaintiff "arbitrarily excis[ed] … alternative options" from relevant market). Courts routinely dismiss antitrust claims for failure to

plead a plausible relevant market,[12] including in cases involving pharmaceuticals.[13] Here, the district court did exactly what this Court requires—it assessed whether Regeneron asserted "sufficient facts to allege plausibly the existence" of a PFS-only market and, concluding the answer was no, dismissed the Complaint. *Concord Assocs.*, 817 F.3d at 53.

Second, Regeneron argues that the district court "invented" a "legal rule that markets generally cannot be coextensive with a patent." Br. 24, 42-46. *Amici* echo that argument,[14] though the federal agencies notably do not urge reversal.[15] The district court actually *disavowed*

---

[12] *E.g.*, *Concord Assocs.*, 817 F.3d at 46; *Chapman*, 546 F.3d at 238-39; *Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 708 F.App'x 29 (2d Cir. 2017); *Madison 92nd St. Assoc., LLC v. Courtyard Mgmt. Corp.*, 624 F.App'x 23 (2d Cir. 2015); *Skyline Travel, Inc. v. Emirates*, 476 F.App'x 480 (2d Cir. 2012); *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F.App'x 372 (2d Cir. 2011).

[13] *E.g.*, *Bayer*, 813 F.Supp.2d at 578; *Am. Sales*, 2011 WL 1465786; *Humana Inc. v. Mallinckrodt ARD LLC*, 2020 WL 3041309 (C.D. Cal. 2020); *Bayer Schering Pharma AG v. Watson Pharms., Inc.*, 2010 WL 11578470 (D. Nev. 2010); *Lannett Co. v. KV Pharm.*, 2009 WL 10737496 (D. Del. 2009).

[14] *E.g.*, DOJ/FTC Br. 22-28; States' Br. 11-13; Open Markets Br. 24-28; Dkt. 96 ("AAI Br.") 5-29; Dkt. 103-2 ("Professors' Br.") 15-17.

[15] The federal agencies argue that the district court applied the wrong tools, but take no position on whether Regeneron pleaded facts supporting a plausible PFS-only market. DOJ/FTC Br. 1.

any categorical rule: it recognized that a patent may be "so novel that there really is no fitting substitute," such that "the relevant product market would have to be constrained to the patented product." SPA-27. But, the court continued, Regeneron failed to show "that this case fits that bill": "[i]nstead of explaining why consumers would not be so free to choose between a vial or a PFS delivery system for an anti-VEGF as to create a separate market, Regeneron merely explained that the PFS is, like all valuable patented products, at least marginally superior to the vial." SPA-27-28. That is no sweeping rule.

That patents are typically not coextensive with market boundaries is not controversial. The *amici* federal agencies themselves recognize that "there will often be sufficient actual or potential close substitutes for [a patented] product, process, or work to prevent the exercise of market power." U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY §2.2 (2017). That is why "a patent does not necessarily confer market power upon the patentee." *Ill. Tools Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45-

46 (2006). Otherwise, every instance of patent fraud would "give rise to an antitrust claim by definition." SPA-26-27.[16]

Finally, Regeneron faults the district court for "never even cit[ing] *Brown Shoe*." Br. 41. But this Court reviews judgments, not opinions, and neither this Court nor the district court is required to address the *Brown Shoe* indicia. Indeed, this Court routinely affirms dismissals of antitrust claims for failure to plead plausible relevant markets without applying those indicia. *E.g.*, *Chapman*, 546 F.3d at 237-38; *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F.Supp.3d 547, 584 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136, 140 (2d Cir. 2019) ("adopt[ing] the District Court's discussion in all respects"); *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F.Supp.2d 465, 472 (E.D.N.Y. 2005), *aff'd*, 472 F.3d 23, 32 (2d Cir. 2006); *Smugglers Notch*, 414 F.App'x at 376. In any event, the district court fully considered Regeneron's alleged "indicia"—it just found them wanting. That decision was correct.

*Brown Shoe*'s "practical indicia" are neither independent pleading requirements nor substitutes for standard market-definition principles.

---

[16] Regeneron notably does not allege any "[t]echnology market" consisting of the licensed patent and its close substitutes. ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY, *supra*, § 3.2.2.

*See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) ("practical indicia" do not "exclude economic analysis altogether"). Even when relying upon practical indicia, a plaintiff must define a plausible market in terms of "reasonable interchangeability" and "cross-elasticity of demand." *Brown Shoe*, 370 U.S. at 325; *see Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (*Brown Shoe* "simply clarifies whether two products are in fact 'reasonable' substitutes and therefore part of the same market").

The district court understood that framework. It considered Regeneron's alleged indicia of a PFS-only market—that PFSs are "quicker, easier, and safer" and "that manufacturing anti-VEGF vials requires different equipment than making a PFS"—and correctly found that those allegations say nothing "about whether a *consumer* would find a vial and PFS interchangeable." SPA-24-25.

Invoking *Brown Shoe*, Regeneron argues that a PFS-only market is plausible because (i) PFSs have "practical and medical" benefits recognized by the "industry"; (ii) doctors have shifted "their patients from vials to PFS in droves"; (iii) "the entry of Eylea PFS" led to Lucentis PFS's "loss of market share" and "price erosion"; and (iv) PFSs involve

"unique production" and "regulatory approval" distinct from vials.  Br. 29-33.  None of these alleged "indicia" move the needle on whether consumers see anti-VEGF vials and PFSs as inadequate substitutes.

**Regeneron's allegations confirm that even if PFSs have medical and practical benefits, they compete with vials.**  Regeneron argues that because "PFS treatments have important practical and medical benefits that distinguish them from alternative treatment methods, including vials," the "industry" recognizes them as better.  Br. 29-39.  Those allegations do not establish that vials and PFSs are not economic substitutes.

First, that PFSs offer some convenience and safety benefits does not render them non-interchangeable with vials.  As explained, reasonable interchangeability does not require exact equivalence.  *Supra* Part I.A.1.  Even if there is "some degree of preference" for PFSs over vials, that is not enough to make them non-competitive because, as Regeneron's allegations show, "either would work effectively" to treat the same diseases.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997).

Take *LLM Bar Exam v. Barbri*. There, this Court adopted a district court opinion dismissing antitrust claims where the plaintiff defined a proposed market by pointing to product benefits, but failed to plead facts demonstrating a lack of interchangeability with alternatives. 922 F.3d at 140. Contending that LL.M. bar review courses comprised a separate market from J.D.-focused courses, the plaintiff alleged that LL.M. courses "catered directly to the needs" of foreign students. *LLM Bar Exam*, 271 F.Supp.3d at 559. The courses, for example, offered unique subjects and accounted for the fact that "most foreign LL.M. graduates are not native English speakers." *Id.* at 558-59.

That market was "implausible." *Id.* at 584. The unique benefits of LL.M.-focused courses did not make J.D.-focused courses inadequate substitutes. *Id.* at 583-84. That LL.M. students had traditionally enrolled in "the same bar review classes as their J.D.-holding peers" showed that J.D.-focused courses *were* interchangeable. *Id.* at 584 (emphasis omitted). That "obvious overlap" belied the assertion that LL.M.- and J.D.-focused courses occupied distinct markets. *Id.*

Similarly, Regeneron's allegations evince an "obvious overlap" between the use of anti-VEGF vials and PFSs. Regeneron argues that

PFSs' benefits give them "a competitive advantage over vials," Br. 2, and that those benefits lead many patients to PFSs, similar to how many foreign students opted for LL.M. courses over J.D.-focused ones. *See* 271 F.Supp.3d at 557. But as Regeneron admits, patients with eye diseases have long been served by anti-VEGF vials, including before the advent of PFSs. JA336 (¶6). The benefits of PFSs do not negate the reality that patients can (and do) use anti-VEGF vials for the same purposes—just as the benefits of LL.M.-focused bar courses did not negate foreign students' enrollment in J.D.-focused courses.

That some in the "industry" recognize PFSs' benefits is immaterial. Industry recognition of PFSs' "advantages," Br. 4, only matters if consumers view PFSs as a "separate economic entity," *Brown Shoe*, 370 U.S. at 325. In *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989), for example, certain "trade publications" and "industry executives" viewed "home center stores"—stores for home-improvement supplies—as "distinguish[ed] from other stores by the variety of products and the trained sales staffs that home centers offer." *Id.* at 1376. The Ninth Circuit rejected the argument that "industry recognition" showed separate markets. *Id.* Even if the "industry" recognized

differences, the court explained, that "reveal[ed] nothing about the purchasing proclivity" of customers: the plaintiff failed to show that recognition of home center stores' unique qualities reflected an "economically significant barrier to customer cross-over." *Id.*

The same reasoning applies here. Even if the "industry" recognizes PFSs' benefits, Regeneron does not plausibly allege that the industry's "perception" delimits the "actual field of competition." *Id.* To the contrary, Regeneron alleges that patients and doctors see vials and PFSs as alternative "choice[s]," JA346 (¶21); *see* JA365 (¶88) ("some" patients chose Lucentis PFS, others chose Eylea vials), even if PFSs have a "competitive advantage," JA364 (¶85). In fact, Regeneron's Complaint *confirms* that anti-VEGF vials and PFSs are recognized as "competing drugs." JA336 (¶5). These admissions show that any recognition of PFSs' "advantages" does not limit the "actual field of competition" to PFSs. *Thurman Indus.*, 875 F.2d at 1376; *see Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122 (9th Cir. 2018) (allegations that industry recognized live-action advertising as "unique" and "exponentially more effective" than alternatives did not "indicate that these advertising formats are not reasonably interchangeable"; affirming dismissal).

***Doctors' shifting of patients between anti-VEGF vials and PFSs confirms that the products are economic substitutes.*** Regeneron asserts that its allegation that "doctors have converted their patients from vials to PFS in droves" necessarily establishes that "a small, but significant, price increase in the PFS version would not cause physicians" to switch back. Br. 31. Put another way, Regeneron argues that PFSs are *such good substitutes* for vials that the two forms of packaging are not reasonably interchangeable. Not only is that illogical, it also is not supported by law. Regeneron does not cite any case holding that widespread substitution of one product for another is evidence that the two products are *not* reasonably interchangeable. *Cf. Geneva*, 386 F.3d at 497 (evidence of *low* switching from brand-name to generic warfarin suggested separate markets).

Nor could it. "[A]ctual shifts between two products in response to—or even without—changes in their relative prices indicate a single market." PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶562(a) (2020). In *United States v. Continental Can Co.*, 378 U.S. 441 (1964), for example, the Supreme Court found that "the shift [from metal] to glass as the dominant container" for baby food ("80% of the

Nation's baby food now moves in glass containers") suggested that glass containers and metal cans compete "for the same end uses" in the same market. *Id.* at 450, 453; *see also FTC v. Shkreli*, 2022 WL 135026, at *36 (S.D.N.Y. 2022) (finding one-way substitution from branded to generic drug indicated "high degree of cross-elasticity in demand" between the products). Likewise here, the fact that doctors have widely "converted" patients from vials to PFSs corroborates that vials and PFSs are therapeutic *and* economic substitutes.

And lest there be any doubt that substitution goes both ways, Regeneron alleges that consumers can also switch from PFSs to vials. If Eylea PFS were unavailable, Regeneron says, physicians and patients would "choose between" Lucentis PFS, Beovu vials, and Eyela vials. JA414-15 (¶189). And Regeneron accuses Novartis of trying to "steer patients" from Eylea PFS to Beovu vials—which would not make any sense *unless* vials and PFSs were reasonable substitutes. JA435 (¶244).

What is more, Regeneron's claim that patients switched from vials to PFSs "in droves," Br. 10, overstates its actual allegations. Regeneron pleads that patients rapidly switch from the vial to PFS version of a given drug—for example, Eylea patients largely switched from vials to

PFSs.  JA355 (¶¶61-62).  But Regeneron admits that "[w]hen Lucentis PFS … competed against Eylea in vial form only," Br. 31-32, "some" chose to switch from "the vial form of Eylea" to Lucentis PFS, while others stuck with Eylea (supposedly because it is "superior").  JA365 (¶88). That weighing of pros and cons, with some choosing PFSs and others choosing vials, is the essence of competition.  Some people prefer a sports car over a sedan, but that does not mean the cars are not substitutes.  To the extent Regeneron's allegations are "practical indicia" of anything, then, they point to a market in which vials and PFSs *compete*.

***Novartis's alleged loss of market share and price erosion following Eylea PFS's launch confirm that vials compete against PFSs.***  Regeneron next asserts that it has alleged "*direct evidence* that the PFS presentation enabled Novartis to grow market share and increase prices vis-à-vis vials," and that that means vials and PFS do not compete.  Br. 31 (emphasis in original).  Regeneron states that when Lucentis PFS "competed against Eylea in vial form only," Lucentis had a "competitive advantage" over Eylea.  Br. 31-32.  But following Eylea PFS's launch, Regeneron claims, Novartis "admitted" in the patent case that it experienced a "'loss of market share' and 'price erosion.'"  Br.

32.[17]  Regeneron says this shows that Eylea PFS imposed "competitive pressures that Lucentis PFS did not face from vials alone," which Regeneron spins as "[d]irect evidence" of "pricing power."  Br. 32, 39.

Wrong on both law and logic.  To begin, Regeneron's admission that "Lucentis PFS … competed against Eylea in vial form" repudiates the notion of a PFS-only market.  Br. 31-32.  After all, the "relevant market" is "the area of effective competition."  *AD/SAT*, 181 F.3d at 227.  If PFSs have a "competitive advantage" over vials, JA363-64 (¶85), one would *expect* an anti-VEGF PFS to fare better against vials than against other PFSs—but that does not mean PFSs and vials occupy distinct markets.  *See Queen City Pizza*, 124 F.3d at 437.

Not only that, Regeneron's suggestion that "loss of market share" and "price erosion" provide "direct evidence" of "pricing power" is nonsensical.  Br. 31-32 & n.9, 39.  True, in some cases, monopoly power may be shown "directly by evidence of the control of prices."  *Top Mkts.,*

---

[17] Regeneron assumes Novartis's patent-infringement allegations refer to Lucentis PFS, Br. 32, but Novartis's complaint does not mention Lucentis PFS.  *See* No. 20-cv-00690 (N.D.N.Y. July 28, 2020), Dkt. 1.  Regeneron admits that Beovu, the only anti-VEGF Novartis sold in the U.S., comes in vials.  JA355 (¶64).

*Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).[18]  But experiencing "price erosion" and "loss of market share" is the opposite of controlling price.  *See PepsiCo*, 315 F.3d at 107-08 ("The more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share.").  The Complaint itself vitiates Regeneron's argument that Novartis has "pricing power in the PFS market": it alleges that Novartis "*will have* the power to increase prices" *if* it achieves monopoly power in the future.  JA425 (¶215).  That speculative prediction says nothing about whether Novartis currently possesses, or is dangerously close to achieving, monopoly power.  *See Top Mkts.*, 142 F.3d at 98 (evidence that does not speak to defendant's "present ability to raise prices" says nothing of monopoly power).[19]

---

[18] In raising this argument, Regeneron half-heartedly suggests that it need not define a market at all.  Br. 32 & n.9.  Incorrect.  "A showing of market power is a substantive element of [a] monopolization claim … and plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006), *overruled on other grounds*, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008); *see Amex*, 138 S.Ct. at 2285 n.7 (same for vertical-restraint cases).

[19] Relying on data outside the pleadings, the *amici* professors observe that Lucentis prices "began to fall" in 2017, "when Novartis [*sic*]

***That anti-VEGF PFSs and vials involve different produc-
tion processes does not mean the products are not substitutes.***
Lastly, Regeneron argues that PFSs and vials do not compete because
they require different production facilities and regulatory approval pro-
cesses.  Br. 39.  But unique production facilities or regulatory approval
processes do not matter unless they make the at-issue products poor
economic substitutes.  Consider *Brown Shoe* itself.  There, the Supreme
Court found "unique production facilities" for men's shoes probative of
market definition because those facilities made products "directed to-
ward a distinct class of consumers"—men, not women.  370 U.S. at 325-
26; *see Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art
& Design*, 73 F.Supp.2d 829, 837-38 (W.D. Mich. 1999) (rejecting pro-
posed market despite allegations that products involved distinct regula-
tory approval processes), *aff'd*, 244 F.3d 521 (6th Cir. 2001).  When pro-
duction differences have no bearing on whether consumers would sub-

---

launched Lucentis PFS."  Professors' Br. 21 n.19.  At that time, Lucen-
tis PFS "competed against Eylea in vial form only."  Br. 32.  Declining
prices are evidence of competition, not monopoly power.

stitute the products, those differences are not an "economically signifi-cant barrier to customer cross-over." *Thurman Indus.*, 875 F.2d at 1376.

The Supreme Court's decision in *Continental Can* confirms the point. The Court explained that even though glass bottles and metal cans required different "machinery," that was "not sufficient to obscure the competitive relationships" the record otherwise "reveal[ed]." 378 U.S. at 450. The record, for example, showed that manufacturers of glass bottles and metal cans each "promote[d] their lines of containers at the expense of [the] other." *Id.* at 452. Wary of "unduly narrow[ing]" the market, the Court rejected the argument that production differences made for separate markets. *Id.*

Similar to the plaintiff in *Continental Can*, Regeneron asserts that PFSs and vials are made differently. JA419 (¶199). So stipulated. But Regeneron does not allege that those differences preclude substitution by doctors and patients. And as in *Continental Can*, treating produc-tion differences as indicative of separate markets would "obscure the competitive relationship" the record "so compellingly reveals": here, that doctors and patients substitute PFSs and vials, *supra* Part I.A.2, and

that producers of vials and PFSs "promote their lines of [anti-VEGFs] at the expense of [the] other," 378 U.S. at 450, 452; *see* JA412 (¶183) (Novartis "steer[s] physicians and patients" from Eylea PFS to Beovu vials).  In light of the commercial reality that Regeneron itself alleges, this Court should affirm the district court's finding that "difference[s] in the equipment required to produce a PFS as opposed to a vial says nothing about whether a consumer would find a vial and PFS interchangeable."  SPA-25.

\* \* \*

If anything, Regeneron's "practical indicia" allegations *undermine* its contrived PFS-only market.  Regeneron alleges that vials and PFSs treat the same diseases, target the same consumers, are administered the same way, are sold by the same companies, and (at least with respect to Eylea) cost the same.  JA348-49, 352, 354-55 (¶¶33, 37, 52, 60-61).  In other words, Regeneron does not (and cannot) allege that vials and PFSs have distinct "uses," "customers," "vendors," or "prices"—ignoring nearly all of the *Brown Shoe* indicia.  *See* 370 U.S. at 325.[20]

---

[20] Regeneron's cases confirm the point.  Regeneron relies primarily on *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at \*7 (D. Utah 2018); *Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268, at \*13

That is why this case is worlds apart from *Geneva*, which Regeneron cites in arguing that practical indicia may "independently suffice to establish" a relevant market. Br. 33. There, this Court held that generic and branded versions of the same drug did not compete in the same market. 386 F.3d at 485. In reaching that conclusion, the Court emphasized that the branded and generic drugs had significantly different prices, there was low brand-to-generic conversion (the first generic "captured just 8 percent" of sales in year one), the brand and generics were marketed to different customers, and generic company witnesses testified that "they ma[d]e pricing decisions … based on generic competition, not competition from" the brand. *Id.* at 497-98.

---

(S.D.N.Y. 2014); and *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 383 F.Supp.3d 187, 225-27 (S.D.N.Y. 2019), to argue that practical indicia illuminate market boundaries. In each case, the courts accepted plaintiffs' proposed markets because—unlike Regeneron—they pleaded facts indicating that consumers viewed the products as non-interchangeable. *See Thompson*, 2018 WL 2271024, at *8-9 (alleging that *consumers* perceived the "online [contact lens] retailers' business" as non-substitutable with "brick-and-mortar" contact lens retailers); *Maxon*, 2014 WL 4988268, at *12-13 (alleging that *purchasers* would find no adequate substitute for "vehicle history reports"); *Keurig*, 383 F.Supp.3d at 226 (noting importance of consumer perspective and behavior in defining relevant market).

*Geneva* highlights the implausibility of Regeneron's PFS-only market.  Whereas *Geneva* involved a large "price differential," *id.*, Regeneron does not allege any similar price difference between vials and PFSs.  In fact, when Regeneron launched Eylea PFS, it did *not* raise prices.  JA355 (¶61).  And in contrast to the low rate of brand-to-generic substitution in *Geneva*, Regeneron alleges substitution from vials to PFSs in "droves."  Br. 10; *see* JA419 (¶200).  Unlike the drugs in *Geneva*, Regeneron gives no indication that anti-VEGF vials and PFSs are marketed to different customers.  And whereas the "industry recognition" evidence in *Geneva* revealed generic manufacturers' view that they competed with each other and not the brand, 386 F.3d at 498, Regeneron admits that manufacturers of anti-VEGF vials and PFSs see themselves as competitors.  *E.g.*, JA336 (¶5) (vials and PFSs are "competing drugs"); JA412 (¶183) (Novartis "steer[s]" consumers from Eylea PFS to Beovu vials).  All said, *Geneva* just confirms that Regeneron's allegations do not establish that a PFS-only market is plausible.

The Court should affirm the district court's dismissal of Regeneron's antitrust claims for failure to allege a plausible market.

### B. Regeneron Fails To Plead Facts Plausibly Demonstrating That Novartis Has Monopoly Power In The Purported PFS-Only Market

Regeneron's antitrust claims also fail because Regeneron does not allege that Novartis possesses *any* power in the purported anti-VEGF PFS market, much less monopoly power. *See Kaufman*, 836 F.3d at 147-48. As explained above, Regeneron's claims require allegations that Novartis has the "ability to lessen or destroy competition." *Spectrum Sports*, 506 U.S. at 456; *see supra* pp. 22-23. "Market share is the primary indicator" of that power. *Twin Labs.*, 900 F.2d at 570. That requires Regeneron to plead that Novartis has a market share of at least 40% to 50% in a properly defined market. *Supra* pp. 22-23.

Regeneron fails to meet that requirement for two reasons. First, Regeneron admits that Genentech, not Novartis, sells Lucentis PFS in the alleged U.S. anti-VEGF PFS market. Second, even assuming Genentech's Lucentis sales could be imputed to Novartis, Regeneron does not allege Lucentis PFS's market share.[21]

---

[21] *Amici* recognize that Regeneron must allege that Novartis has monopoly power. *E.g.*, DOJ/FTC Br. 12; States' Br. 13; Professors' Br. 10; AAI Br. 22-23; Open Markets Br. 16. None of them address Regeneron's failure to do so.

### 1. Regeneron Fails To Plead That Novartis Competes In The U.S. PFS-Only Market

"[I]t is axiomatic that a firm cannot monopolize a market in which it does not compete." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998). Regeneron's paradoxical allegation that Novartis has attempted to monopolize the U.S. "anti-VEGF PFS market" without selling anything in that market is fatal to each of its antitrust claims.

Regeneron's antitrust claims rest on the bare assertion that "Lucentis PFS has possessed … monopoly power since its 2017 U.S. launch." JA420 (¶203). Yet as Regeneron concedes, "Genentech … markets Lucentis in the United States." JA334-35 (¶2); *see* JA334, 352 (¶¶2 n.1, 52). How can Novartis monopolize a market in which it does not sell the product? Under this Court's longstanding precedent, Genentech's market share cannot be imputed to Novartis. *See H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (affirming that "the market shares of [two firms] could not be aggregated to establish an attempt to monopolize").

Attempting to circumvent that bedrock principle, Regeneron pleads that Novartis owned a *minority* share in Roche, Genentech's parent, JA352 (¶53); Novartis "co-developed" Lucentis PFS, JA334 (¶2); and Novartis licenses the '631 Patent to Genentech, JA352-53 (¶54). Those allegations fall short. Absent an alter ego relationship or similar dominion over the firm in the relevant market—which Regeneron does not allege between Novartis and Genentech—a plaintiff may not aggregate or impute market shares. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2005) (entity does not compete in relevant market unless it exercises "substantial control over the affairs and policies" of a firm in that market). That holds true even where the defendant licenses others to manufacture the relevant product,[22] contracts with another company to sell a

---

[22] *E.g.*, *Minebea Co. v. Papst*, 444 F.Supp.2d 68, 216 (D.D.C. 2006) (defendant "cannot have market power" because it "does not make or sell [product]; it simply licenses patents").

product in the relevant market,[23] or has "ultimate control" over products in the relevant market.[24]  Courts have rejected imputation even where the defendant has a much closer connection to the market than Regeneron alleges here, such as a sister company or parent-subsidiary relationship.[25]

That is why this Court held that Ford dealers' market shares could not be imputed to Ford in an antitrust case, despite the fact that Ford sold the relevant products (so-called "crash parts") "exclusively to its franchised Ford dealers." *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1022, 1030 (2d Cir. 1976).  It did not matter that Ford franchised the dealers and sold crash parts exclusively through them, just as it does not matter that Novartis licenses the '631 Patent to Genentech to facilitate sales of Lucentis PFS in the United States.  *Id.*

---

[23] *E.g.*, *Mercy-Peninsula Ambulance, Inc. v. San Mateo Cty.*, 791 F.2d 755, 759 (9th Cir. 1986) (defendant could not monopolize market for ambulance services despite authorizing the providers in that market).

[24] *E.g.*, *Name.space, Inc. v. ICANN*, 795 F.3d 1124, 1128, 1131-32 (9th Cir. 2015) (defendant could not monopolize markets for top-level domains (TLDs), despite having sole authority to add new TLDs).

[25] *E.g.*, *Spanish Broad. Sys.*, 376 F.3d at 1075 (minority-owned subsidiary); *In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at *6-8 (E.D. Pa. 2017) (sister company).

at 1030.  Novartis's role as licensor does not make it a monopolist in the alleged anti-VEGF PFS market any more than Ford's role as franchisor made it a monopolist in the crash parts market.  *Id.*

Regeneron faces the same obstacles that led to dismissal in *In re Wellbutrin XL Antitrust Litigation*, 2009 WL 678631 (E.D. Pa. 2009). The plaintiffs alleged that Biovail and GSK collaborated "to bring a single product to the market," similar to Novartis and Genentech's co-development of Lucentis.  *Id.* at *7-8.  "Biovail d[id] not sell [the drug] in the United States," just as Novartis does not sell Lucentis PFS in the United States, yet the plaintiffs insisted that Biovail was a monopolist because it licensed GSK to sell the drug in the U.S. and received royalties from GSK's sales.  *Id.*  The court dismissed the monopolization claim against Biovail because Biovail did not compete in the relevant market.  *Id.*  That same reasoning supports affirmance here: *even if* Novartis licenses Genentech to sell Lucentis PFS, and *even if* Novartis benefits from that relationship, Novartis does not have monopoly power.

Adopting Regeneron's argument that a licensee's market share can be imputed to a licensor would lead to nonsensical results.  Regen-

eron's own allegations illustrate why. If Regeneron had taken a subli-

cense to the '631 Patent from Vetter, then by Regeneron's logic, Novar-

tis could be deemed a monopolist based on *Regeneron's* sales of Eylea

PFS. This is not and cannot be the law.[26]

### 2. Regeneron Fails To Plead That Lucentis PFS Has Any Share Of The Alleged PFS Market

Even if Regeneron could impute Genentech's Lucentis PFS sales

to Novartis, that would not save its claims. Regeneron commits a rudi-

mentary error: it does not plead that Lucentis PFS has any particular

share of the alleged PFS-only market. That requires affirmance. *See*

*Kaufman*, 836 F.3d at 148 (affirming dismissal where plaintiff failed to

allege defendant's share of relevant markets); *RxUSA Wholesale, Inc. v.*

*Alcon Labs., Inc.*, 661 F.Supp.2d 218, 234-36 (E.D.N.Y. 2009) (dismiss-

ing claims for failure to allege defendants' market shares).

---

[26] In opposing Novartis's motion to dismiss, Regeneron cited three out-of-circuit district court decisions—*AG Fur Industrielle Elektronik AGIE v. Sodick Co.*, 748 F.Supp. 1305 (N.D. Ill. 1990), and two cases citing *AG Fur*—to argue that a licensee's market share may be imputed to a licensor. That scant caselaw contradicts this Court's rule against imputing market shares, and ignores the bulk of out-of-circuit authority that agrees with this Court.

Regeneron's Complaint never identifies Lucentis PFS's current share of the alleged anti-VEGF PFS market. All it says is that Lucentis PFS has a "significant" share. JA428 (¶226). That is a conclusion, not a factual allegation—and it is one more reason to affirm dismissal. *See Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F.Supp.3d 303, 323-24 (S.D.N.Y. 2014) ("conclusory" statement that defendant had "very substantial market share" insufficient to support attempted monopolization claim); *LLM Bar Exam*, 271 F.Supp.3d at 584 (dismissing complaint where plaintiff "provide[d] no indication" of defendant's market share), *aff'd* 922 F.3d at 140 (adopting opinion).

* * *

Because Regeneron pleads neither a plausible "anti-VEGF PFS" market nor facts showing that Novartis has any power in that market, the Court should affirm dismissal of Regeneron's antitrust claims.

## II. The Court Should Affirm The District Court's Dismissal Of All Claims Because They Are Untimely

Even if the Court finds that Regeneron pleads a plausible market in which Novartis has monopoly power, Regeneron's claims are too

late.[27]  Regeneron was required to bring its tortious-interference claim within three years of when it first suffered injury, *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993), and its antitrust claims within four years, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190-91 (1997).  Regeneron says it first suffered injury in "late 2013," when Vetter allegedly "cut off Regeneron," "forc[ing]" Regeneron "to invest significant time, money, and effort" to find an alternative filler.  JA404, 408 (¶¶166, 175).  That means Regeneron had to bring its tort claim by 2016 and its antitrust claims by 2017.  It did not sue until 2020.

Regeneron argues that the limitations period for its tortious-interference claim should be tolled.  Br. 49.  But it does not plead the predicates to invoke any exception to the statute of limitations, and its Complaint shows that Regeneron knew or should have known of its injury and Appellees' alleged conduct during the limitations period.  Regeneron was obligated to promptly sue.  It just never did.

---

[27] Appellees are "entitled to seek affirmance on any ground supportable by the record." *Janese v. Fay*, 692 F.3d 221, 225 (2d Cir. 2012).  Consideration of alternative grounds is particularly appropriate where, as here, "the unaddressed issues present pure questions of law," *Bascolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012), and it would "further the interest of judicial economy," *Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 389 (2d Cir. 2015).

While Regeneron only addresses the timeliness of its tortious-interference claim, its delay invalidates *all* of its claims. The Court may affirm the dismissal of the entire Complaint as untimely.

## A. Regeneron Fails To Plead With Particularity That Extraordinary Circumstances Prevented It From Filing Earlier

The district court rejected Regeneron's tolling argument for two reasons. First, Regeneron waived the argument because "it spent not a single word defending its tortious interference claim." SPA-31. Second, and "in the alternative," Regeneron's justifications for delay failed on their merits. *Id.* This Court should affirm on either basis.

### 1. Regeneron Waived Its Equitable Tolling Argument By Failing To Raise It Below

The district court is right that Regeneron waived any argument that its tort claim was timely. SPA-31. Where a party is "counseled," the Court may "infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014). Regeneron was required to do more than "issue[] a general invitation" for the district court to weigh in; it had to make "particularized arguments." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1214 (2d Cir. 1987).

Regeneron did not.  Below, Regeneron "provided a staunch defense for the timeliness of its antitrust claims," yet "spent not a single word defending its tortious interference claim."  SPA-31.  On appeal, Regeneron points to a heading stating that "All of Regeneron's Claims Are Timely," and says it "specifically quoted, at full length," the legal standard in a footnote.  Br. 58.  Regeneron knows better—that is a "general invitation," not a "particularized argument."  *Lowen*, 829 F.2d at 1214; *see Lin v. USCIS*, 2008 WL 5063296, at *2 (2d Cir. 2008) (plaintiff waived argument where it provided only "a boilerplate recitation of the standard" and a "one sentence … discussion" of the claim).

Because Regeneron's silence below "extinguishes" its argument about the timeliness of its tort claim, *United States v. Williams*, 930 F.3d 44, 64 (2d Cir. 2019), this Court should not consider it.

### 2. Regeneron Fails To Plead Fraudulent Concealment With Particularity

Regeneron's late-breaking tolling argument also fails on the merits.  Regeneron contends that equitable estoppel applies because it alleges that "Novartis actively concealed the inventorship fraud until discovery in this litigation."  Br. 49.  Specifically, Regeneron says it could not have discovered its claims until Vetter produced the October 2013

Fourth Amendment that settled Appellees' IP-ownership dispute. Br. 49-50. Regeneron's actual allegations tell a different story—one that "make[s] equitable estoppel impossible." SPA-32.

Courts may "excuse" a litigant's "delay" only where "extraordinary circumstances prevented [the plaintiff] from filing [its claim] on time." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000). Regeneron seeks to excuse its delay by accusing Appellees of fraudulent concealment. Br. 6. Under New York and Second Circuit law, fraudulent concealment requires a showing that "the defendant fraudulently conceal[ed] the wrong" and the plaintiff did not discover, "or by the exercise of reasonable diligence" could not have discovered, its claims during the limitations period. *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983). This "uncommon remedy" applies only when the defendant affirmatively conceals its "initial wrongdoing," *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 198 (N.Y. 2007), or has a duty that creates "an obligation to inform [the plaintiff] of facts underlying the claim" but fails to do so, *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006).

Like any other fraud claim, fraudulent concealment "must be stated with particularity." Fed.R.Civ.P. 9(b). That requires a plaintiff

to "explain why the statements … are fraudulent," "identify the speaker," and "state where and when the statements … were made." *Olson*, 29 F.4th at 71.  Put differently, the plaintiff must state the "who, what, when, where, and why of the fraud at issue." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018).

Regeneron cannot meet this standard.

***Concealment.***  Regeneron does not plead particularized facts showing that Appellees affirmatively concealed Vetter's supposed contributions to the '631 Patent or that they had a duty of disclosure to Regeneron.  To start, Regeneron argues that Novartis  "purchased Vetter's silence and complicity by offering Vetter ██████████████████ ███████ and a co-exclusive license over the patent with the right to sub-license."  Br. 50.  Yet Regeneron never explains how contracting with a supplier or licensing a patent—common business arrangements—hides anything, much less constitutes fraud.

Regeneron admits that Vetter disclosed the IP-ownership dispute, its resolution, and Novartis's patent applications to Regeneron, JA242-48, but complains that Vetter "refused to disclose the details or produce an original copy of the 2013 Amendment," Br. 51.  Regeneron would

have this Court hold that one company has a right to ask a business partner to produce confidential agreements with that company's competitors. The law forecloses that proposition: absent a "fiduciary relationship" obliging the defendant to "inform" the plaintiff "of facts underlying the claim," *Zumpano*, 849 N.E.2d at 930, "mere silence or failure to disclose the wrongdoing is insufficient," *Ross*, 868 N.E.2d at 198. Regeneron alleges no fiduciary duty.

Finally, Regeneron claims Novartis "transferr[ed] to itself exclusive enforcement authority" over the '631 Patent in 2019 so it could sue Regeneron "without also disclosing Vetter's role." Br. 52. The 2019 amendment actually required ████████████████████████

████████████████████████████████████████████

██████ CA251-52 (§2.2(d)(ii)). In any event, reaffirming that a *patent holder* can enforce its patent is not fraudulent.

Regeneron's only rejoinder is to mischaracterize the district court as holding "that a defendant can avoid equitable estoppel by deceiving the public in addition to the plaintiff." Br. 53. Nonsense. Citing *Twersky v. Yeshiva University*, 993 F.Supp.2d 429, 442 (S.D.N.Y.), *aff'd*, 579 F. App'x 7 (2d Cir. 2014), the district court correctly explained that

a plaintiff must allege facts showing that the defendant's deceptive conduct was *aimed at* the plaintiff—not just the public.  SPA-33.

That accords with New York law, which says plaintiffs cannot invoke equitable tolling based on fraudulent concealment unless they allege a "specific misrepresentation *to them* by defendants," *Zumpano*, 849 N.E. 2d at 930, and further that defendants "intended to defraud the plaintiff," the plaintiffs "reasonably relied upon" the misrepresentation, and the plaintiffs "suffered damage[s] as a result of [that] reliance," *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 326 (N.Y. 1st Dep't 1996).[28]  Regeneron does not allege any "specific misrepresentation" to it, to say nothing of the other elements.

***Ignorance.***  Nor does Regeneron plead any facts showing that it remained ignorant of its claims.  Regeneron raised an improper-inventorship defense in the ITC case in August 2020, months *before* it received the document production that supposedly put it on notice of Appellees' alleged inventorship fraud.  Resp. to Compl. 19-20, USITC Inv.

---

[28] *E.g.*, *United Commodities-Greece v. Fid. Int'l Bank*, 478 N.E.2d 172, 175 (N.Y. 1985); *Jordan v. Ford Motor Co.*, 73 A.D.2d 422, 423-25 (N.Y. Sup. Ct. App. Div. 1980); *Franco v. Roman Cath. Diocese of Las Vegas*, 2009 WL 1777146 (N.Y. Sup. Ct. 2009).

No. 337-TA-1207 (alleging the '631 Patent is invalid "[t]o the extent the invention claimed in the '631 Patent … was derived from Vetter and/or Regeneron employees" pursuant to Regeneron-Vetter collaboration, "which included agreements regarding development of intellectual property"). Regeneron cannot argue that it was unaware of Vetter's alleged co-inventorship until December 2020.[29]

*Reasonable diligence.* Regeneron does not plead that, despite acting with reasonable diligence, it could not have discovered the facts underlying its claims during the limitations period. Rather, Regeneron repeatedly admits it had reason to investigate Appellees' alleged conduct long before 2020. It just never followed through.

In 2013, Vetter informed Regeneron that it settled a dispute with Novartis over "ownership" of a patent application family—including the '631 Patent application—which Vetter disclosed to Regeneron. JA337-39, 404 (¶¶9, 166). Vetter offered Regeneron a royalty-free sublicense

---

[29] Regeneron does not identify anything in Appellees' Fourth Amendment that detailed Vetter's alleged co-inventorship, other than the unremarkable acknowledgement that Vetter "significantly contributed to [the] develop[ment]" of the IP. Br. 12; CA233 (§2.1).

to that patent portfolio on the condition that the license would terminate if Regeneron challenged the patents' validity or enforceability. JA404-06 (¶¶167-70). Regeneron claims this offer gave it "every reason to be concerned," JA405 (¶168), but never explains why "every reason" was not enough cause to investigate further.

It gets worse. Regeneron contends it could not have known of Vetter's contributions to Novartis's patent—or its purported ownership rights under its contract with Vetter—until late 2020. Br. 17. Yet in the Complaint, Regeneron tries to demonstrate its ownership rights by lining up the '631 Patent's claims with work Vetter allegedly performed. JA394-95, 398-99 (¶¶148, 154). Regeneron says the '631 Patent claims "a 1mL prefilled syringe" that meets certain specifications, and alleges that "Vetter developed such [a product] for Regeneron's use during the term of the Eylea PFS Development Agreement," "*well before*" Novartis filed the patent application. JA394-95 (¶148). Because of that, Regeneron says, the invention "invoked Regeneron's ownership rights" under its contract with Vetter. *Id.* Well, that just goes to show that once the

'631 Patent issued in December 2015, JA450 (¶282),[30] Regeneron could have done the *same* analysis and discovered its supposed ownership rights. Why didn't it? Regeneron offers no excuse.

Lastly, Regeneron's inconsistent allegations foreclose any assertion of ignorance or diligence. Regeneron says Novartis should have guessed the IP-ownership terms of the Eylea PFS Development Agreement because those sorts of agreements are "common in the industry." JA403 (¶164). "By the same logic, Regeneron should … have drawn the inverse inference that Vetter and Novartis worked together on Lucentis PFS." SPA-34. Regeneron cannot have it both ways.

Regeneron quibbles that Appellees' Fourth Amendment was "not industry-standard"—and thus that Regeneron could not have inferred the Fourth Amendment's terms—because the agreement also settled an IP-ownership dispute. Br. 57. Regeneron forgets that Vetter specifically informed it of the IP-ownership dispute, the resolution of that dispute, and the particular IP in issue. CA8-9, 77 (¶¶14-15, 177). In light of those disclosures, Regeneron cannot maintain that it had no way of

---

[30] "The existence of a patent application or a public patent puts parties on notice of their existence." *Zirvi v. Flatley*, 433 F.Supp.3d 448, 459-60 (S.D.N.Y. 2020).

inferring that the resolution of an IP-ownership dispute concerning Vetter's work on PFS technology might implicate Regeneron's own IP-ownership rights.  At the least, Regeneron should have investigated.  It didn't.

Regeneron's lack of reasonable diligence precludes estoppel.

## B.    Regeneron Fails To Plead Facts Plausibly Alleging A Continuing Violation

Regeneron also provides no basis for invoking the continuing-violations doctrine.  Where, as here, a plaintiff challenges conduct preceding the limitations period, the continuing-violations doctrine may excuse the plaintiff's tardiness if the defendant committed a "new and independent act" during the limitations period that "inflict[ed] new and accumulating injury."  *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67-68 (2d Cir. 2019).  Performance of an agreement reached before the limitations period does *not* qualify as a "new and independent act" that keeps the limitations period running.  *Id.* at 68-69.  Likewise, conduct during the limitations period that is "merely a reaffirmation of the previous act" is insufficient.  *Id.*

Every act Regeneron alleges in the four years preceding this lawsuit is a byproduct of Appellees' alleged 2013 agreement "to control—

and limit—the supply of anti-VEGF PFS treatments." JA395-96 (¶150).

Take the allegation that in 2017, Vetter again offered Regeneron a sub-license to the '631 Patent. JA408-09 (¶176). Regeneron concedes that Vetter "*reaffirm[ed]* its earlier demand." JA408-09 (¶176). Mere "reaffirmation[s]" are not "new and independent." *US Airways*, 938 F.3d at 68. Or consider the allegation that Appellees amended their agreement in December 2019. Regeneron claims the purpose of that amendment was to *continue concealing* "the Vetter individual(s)' contributions" to the '631 Patent, as allegedly contemplated by Appellees' 2013 agreement. JA339, 344 (¶¶10, 18). Hardly "new and independent." Similarly, Regeneron characterizes Novartis's infringement suits as the "next logical step" in the alleged "conspiracy." JA443-44 (¶265). Taking "the next logical step" in a conspiracy is not "independent" of the conspiracy. *US Airways*, 938 F.3d at 68-69.[31]

---

[31] *See Hebron v. Shelby Cty. Gov't*, 406 F.App'x 28, 31 (6th Cir. 2010) (no continuing violation where defendant "follow[ed] through on its announcement by taking the next logical step"); *In re Ciprofloxacin Hydro-choloride Antitrust Litig.*, 261 F.Supp.2d 188, 229 (E.D.N.Y. 2003) (conduct "contemplated by, and needed to implement," preceding agreement not a continuing violation).

Because Regeneron does not plead a continuing violation, the Court should affirm the dismissal of all claims as untimely.

### III. The Court Should Affirm The Dismissal Of Regeneron's Anticompetitive Scheme And Conspiracy Claims Because Regeneron Fails To Plead Facts Plausibly Alleging That Appellees Foreclosed Access To PFS-Filling Services

The Court should affirm the dismissal of Regeneron's "anticompetitive scheme" and "conspiracy" claims (Counts II and III) for yet another reason: Regeneron fails to plausibly allege that Appellees foreclosed access to PFS-filling services.

These claims hinge on the theory that Vetter's sublicense offer "den[ied] Regeneron access to *any* of Vetter's essential PFS filling services." JA343 (¶17); *see* JA434-35, 441-42 (¶¶ 241-43, 260). When an antitrust plaintiff claims harm from denial of access to an essential input, it must "as a threshold matter" allege "a substantial foreclosure of competition." *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F.Supp.3d 461, 488 (S.D.N.Y. 2017); *see Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) ("competition foreclosed … must be found to constitute a substantial share of the relevant market").

That makes sense: unless a defendant "foreclose[s] so large a percentage of the available supply" that access to an input is "unreasonably constricted," the plaintiff cannot cry foul. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012); *see United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) ("[A]n exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition."). A plaintiff claiming denial of access must therefore allege "more than inconvenience, or even some economic loss"; it must show "that an alternative to the facility is not feasible." *Twin Labs.*, 900 F.2d at 570 (rejecting antitrust claim based on denial of access to magazine advertising space in light of available alternatives); *see Com. Data Servs., Inc. v. IBM Corp.*, 262 F.Supp.2d 50, 75 (S.D.N.Y. 2003) (existence of "numerous alternative channels of distribution" precludes finding of foreclosure); *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983) (losing access to "best, most efficient, and cheapest source of supply" is not "economic injustice").

In *AD/SAT v. Associated Press*, for example, this Court rejected a claim that the defendant violated the antitrust laws by charging the

plaintiff eight times more than it charged its competitor to use its satellite network. The plaintiff—an electronic advertisement service that required access to a satellite network—argued that the disproportionate fee was "tantamount to denial of use." 181 F.3d at 232 n.3. In affirming summary judgment for the defendant, this Court held that because the plaintiff "had not even alleged … that the [defendant] ha[d] a monopoly in the market for satellite services" or that using the defendant's satellite network was "necessary" to compete, there was no antitrust problem. *Id.* at 232. Indeed, "[o]ther firms offer[ed] satellite services, and other modes of electronic transmission … [were] available." *Id.*

Regeneron fares no better. Just as the *AD/SAT* plaintiff claimed the defendant's exorbitant fees were "tantamount to denial of use," Regeneron alleges that Vetter's sublicense offer was so onerous as to "deny Regeneron access" to PFS-filling services. JA339-40 (¶¶10-11). Yet Regeneron "ha[s] not even alleged" that Vetter has a "monopoly" in the PFS-filling market. *AD/SAT*, 181 F.3d at 232. Rather, like the plaintiff in *AD/SAT*, Regeneron acknowledges that alternatives are availa-

ble.  *Id.* at 232; *e.g.*, JA335, 339-40, 408 (¶¶3, 11, 175).  Indeed, it rejected Vetter's sublicence offer *because* it wanted to work with other fillers.  And it did.  JA408 (¶175).

Regeneron's failure to plead that Vetter controls any substantial share of the PFS-filling market, combined with its admission that alternatives exist, negates any claim that Appellees substantially foreclosed access to PFS-filling services.  The Court should affirm the dismissal of Counts II and III on that independent basis.

## CONCLUSION

For these reasons, the Court should affirm the judgment below.

Dated: Washington, DC
      September 9, 2022

Respectfully submitted,

*/s/ Ian Simmons*
Ian Simmons
*Counsel of Record*
Benjamin G. Bradshaw
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:    (202) 383-5300
Facsimile:    (202) 383-5414
isimmons@omm.com
bbradshaw@omm.com

Lisa B. Pensabene
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
lpensabene@omm.com

Stephen J. McIntyre
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
smcintyre@omm.com

Melissa C. Cassel
O'MELVENY & MYERS LLP
2 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
mcassel@omm.com

William M. Jay
Brian T. Burgess
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
wjay@goodwinlaw.com
bburgess@goodwinlaw.com

*Attorneys for Appellees Novartis Pharma AG, Novartis Technology LLC, and Novartis Pharmaceuticals Corp.*

BENJAMIN T. HORTON
JULIANNE M. HARTZELL
MARSHALL GERSTEIN & BORUN
LLP
6300 Willis Tower
233 South Wacker Drive
Chicago, IL 60606

*Attorneys for Appellee Vetter
Pharma International GmbH*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(b) and Local Rule 32.1(a)(4)(A) because it contains 13,992 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f).

This document complies with the typeface and type style requirements of Fed.R.App.P. 32(a)(5)-(6). The brief was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Ian Simmons*

Ian Simmons

Dated: September 9, 2022